Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 11, 2003      Decided December 23, 2003

No. 02-5233

HOWARD P. STEWART,
APPELLANT

v.

JOHN D. ASHCROFT, ATTORNEY GENERAL OF THE UNITED STATES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00265)

*Richard L. Swick* argued the cause for appellant. With him on the briefs was *David H. Shapiro. Heidi R. Burakiewicz* entered an appearance.

*Anne M. Murphy*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Marleigh Dover*, Special Counsel.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and SENTELLE and HENDERSON, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

SENTELLE, *Circuit Judge*: Appellant Howard P. Stewart, a Senior Litigation Counsel in the Environmental Crimes Section ("ECS") of the Department of Justice ("DOJ"), brought this action against John Ashcroft, in his official capacity as Attorney General of the United States, alleging employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Stewart, who is black, challenges two separate incidents in which white candidates were selected over him to be Chief of ECS. The first was the 1998 selection of Stephen Solow; the second, the 2000 selection of David M. Uhlmann. The District Court, considering both challenges, granted summary judgment to the Government. This appeal followed. Stewart contends the District Court erred in concluding: (1) that his non-selections as Chief of ECS were not adverse employment actions; and (2) that he failed to rebut the Government's legitimate, nondiscriminatory reasons for not selecting him. In addition to Appellant's claims, the Government questions whether Stewart's claims surrounding the Solow selection were properly before the District Court. We agree with the Government that only the claim regarding Uhlmann's selection was properly before the District Court. With respect to that claim, we agree with Appellant that the District Court erred in failing to find his non-selection to be an adverse employment action, but because we agree with the District Court that Stewart failed to rebut the Government's legitimate, nondiscriminatory reason for not selecting him, we affirm.

## I.  Background

### A.  Stewart's Employment at DOJ

Appellant Stewart joined DOJ in 1985 as a prosecutor in the Fraud Section of the Criminal Division. From 1987 to

1989, he served as an Assistant United States Attorney ("AUSA") in the Eastern District of Pennsylvania. In 1989 he arrived at ECS, where he has since remained. In 1996, Stewart was appointed to the position of Senior Litigation Counsel, a new Senior Executive Service ("SES") position. This made Stewart the only SES-level person inside ECS, other than the Chief. Throughout Stewart's career at ECS, he has repeatedly applied for leadership positions, including: (1) Chief of ECS in 1994, 1997, and 2000; (2) Deputy Chief of ECS in 1998; and (3) two Assistant Chief positions in 1998. In this litigation, Stewart alleges that his non-selection as Chief in 1998 and 2000 was for reasons of racial discrimination.

### The 1998 appointment of Stephen P. Solow

In 1997, Stewart applied for the then-vacant Chief position. In October of 1997, Lois J. Schiffer, the Assistant Attorney General responsible for filling the vacancy, sent a letter to the Senior Executive Services Board stating that Solow had been selected for the position. On October 30, 1997, she appointed Solow Acting Chief of the Division. In order to comply with federal regulations, the position was re-advertised from January 12 to January 27, 1998, and new applications were considered. On February 3, 1998, Solow was appointed to the SES, a requirement to fill the Chief position. Accordingly, he was appointed on February 3, 1998 to be Chief of ECS.

### The 2000 appointment of Uhlmann

When the Chief position again became vacant in 2000, Stewart again applied. Assistant Attorney General Schiffer was again responsible for the selection. This time, she selected Uhlmann. According to Schiffer, Uhlmann had several qualities that were critical for the job, particularly his management and leadership ability. Like Stewart, Uhlmann had experience working with various United States Attorney's offices around the country. Uhlmann had handled complex cases and was "highly regarded by the Solicitor General's Office." Schiffer Dep. 159.

B. Proceedings Below

Stewart first contacted an equal employment opportunity ("EEO") counselor regarding Solow's selection as Chief on August 12, 1998, and subsequently filed a formal complaint on November 21, 1998. That complaint was amended in 2000 to cover Uhlmann's selection as Chief in that year. Having failed to obtain administrative relief, Stewart filed the present action.

The District Court granted summary judgment to the Government. We pause to note that first, however, the District Court "assume[d] . . . without deciding that . . . the court . . . ha[d] jurisdiction to hear the case." *Stewart v. Ashcroft*, 211 F. Supp. 2d 166, 172 n.1 (D.D.C. 2002), *but see Citizens for a Better Living Env't*, 523 U.S. 83, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment – which comes to the same thing as an advisory opinion, disapproved by the Court from the beginning"); *Galvan v. Federal Prison Indus.*, 199 F.3d 461, 463 (D.C. Cir. 1999) ("Jurisdiction must be established before a federal court may proceed to any other question"). This was an obvious reference to Stewart's challenge of Solow's selection, which the Government had argued was time-barred by the EEOC's regulations governing administrative remedies.

Bypassing the time-bar issue, the District Court determined that the denials of Stewart's applications were the denial of lateral transfers, not failures to promote. This was because Senior Litigation Counsel, Stewart's position, and Chief of ECS were both SES positions that have no difference in pay and benefits. Thus, the Court ruled Stewart had not been subject to an adverse personnel action, as required to establish a *prima facie* case of discrimination. *Brown v. Brody*, 199 F.3d 446, 453 (D.C. Cir. 1999).

Alternatively, the Court concluded that Stewart failed to rebut the Government's legitimate, nondiscriminatory reason for not selecting him – that other candidates were more qualified. Additionally, he failed to present any evidence that the cause of his non-selection was based on race.

## II. Analysis

This Court reviews the grant of summary judgment *de novo*, applying the same standards as the District Court. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Summary judgment should only be granted where there are no genuine issues of material fact, and all inferences must be viewed in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 255, 106 S.Ct. 2505, 2511, 2513-14, 91 L.Ed.2d 202 (1986).

### A. Exhaustion

As an initial matter, we must determine whether this case is time-barred. While the District Court framed its ability to hear these claims as jurisdictional, this Court has noted that the exhaustion of remedies is not jurisdictional, but more akin to a statute of limitations. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) ("The administrative time limits created by the EEOC erect no jurisdictional bars to bringing suit"). While we need not address here the timing requirements as a jurisdictional bar, we must still address these requirements.

The timing requirements for bringing a Title VII claim are set forth in 29 C.F.R. § 1614.105(a)(1), which states in pertinent part:

> An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

29 C.F.R. § 1614.105(a)(1) (2002). Stewart's August 12, 1998 initiation of EEO procedures is untimely if he knew, or should have known, about the alleged discriminatory action prior to June 27, 1998 – 45 days prior to his initial contact with EEO. Solow became Chief of ECS on February 3, 1998. Because Stewart initiated his EEO complaint well after 45 days from this time, he fails to satisfy the requirements of § 1614.105(a)(1). Therefore, Stewart must rely on the tolling provisions of § 1614.105(a)(2), which provide that the time

will be tolled if he "did not know and reasonably should not have [ ] known that the discriminatory matter or personnel action occurred."

With the tolling provision in mind, we consider the events prior to June 27, 1998, to determine if Stewart should have known of Solow's selection. Of course, on February 3, 1998, Solow was appointed to SES and officially selected as Chief. On February 13, 1998, Stewart received a letter that went to all ECS employees and reorganized the entire section. The letter was written by Solow and in it he identified himself as Chief. Further, on June 17, 1998, Stewart wrote a letter to Solow identifying Solow as Chief. Finally, on June 23, Stewart's lawyer, hired to represent him in this matter, sent a letter requesting the status of Solow's appointment.

The evidence shows that at the very least Stewart should have known by June 27, 1998, that Solow had been appointed and any alleged discrimination had occurred. As detailed above, there were several events in February that should have prompted Stewart to inquire about the status of the job he sought. Rather, Stewart waited until June to have his attorney ask. This formalistic event simply does not salvage Stewart's claim. Particularly troublesome is Stewart's letter to Solow identifying Solow as Chief. Stewart's response that calling Solow "Chief" was a mere courtesy does not persuade this Court that Stewart was not aware of Solow's selection prior to June 27, 1998.

Stewart failed to bring his claims regarding Solow's selection to the EEO Counselor in a timely manner and failed to satisfy the tolling provision. Because timely exhaustion of administrative remedies is a prerequisite to a Title VII action against the federal government, the Solow selection is not properly before this Court. *Bowden*, 106 F.3d at 437.

B. Adverse Employment Action

Stewart contends that the District Court's determination that he had not been subjected to an adverse employment action was erroneous. The District Court correctly noted that "plaintiff bears the burden of showing tangible employ-

ment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities." *Stewart v. Ashcroft*, 211 F. Supp. 2d at 173 (citing *Brown*, 199 F.3d at 452). The District Court also correctly noted that "a bruised ego" will not suffice to make an employment action adverse. *Id.* (quoting *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994)). The District Court viewed Stewart's situation as a denial of a lateral transfer, with no change in pay, benefits, or other material consequences. The Court therefore held he had "not suffered an objectively tangible harm." *Id.* at 175 (quoting *Freedman*, 255 F.3d at 848).

We most clearly addressed lateral transfers in *Brown*, where we held:

> A plaintiff who is made to undertake or who is denied a lateral transfer – that is, one in which she suffers no diminution in pay or benefits – does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies are not sufficient to state an injury.

*Brown*, 199 F.3d at 457. This passage answers one question immediately – the District Court was correct in considering this case as one of a lateral transfer. The rule plainly states that a lateral transfer is one in which there is no diminution in pay and benefits. *Id.* It is undisputed that Stewart, already an SES employee, would receive no different pay or benefits if selected as Chief of ECS.

On the present facts, however, *Brown* goes only this far. The remaining language of *Brown* suggests that there *are* lateral transfers that could be considered adverse employment actions. The present facts supply a compelling argument for that case. No matter how one looks at it, the Chief of ECS is the head of the section. He runs the ECS and, most important, he supervises and directs the Senior Litiga-

tion Counsel. Non-selection as Chief of ECS has objective, tangible, and "materially adverse consequences [for] the terms, conditions, or privileges" of Stewart's employment because the Government has denied him the opportunity to advance within the hierarchy of the ECS and the Department more generally. *Brown*, 199 F.3d at 457.

The Government argues that the two SES positions, Senior Litigation Counsel and Chief, are objectively the same. The Government relies particularly on the fact that Stewart would have the same pay and benefits if he were selected as Chief as he does as Senior Litigation Counsel. With respect to other aspects of the Chief position, the Government argues that Stewart's denial of these are "perceived slights," with no objective harm. For instance, they argue that the denial of the ability to gain greater supervisory skills is not an objective harm. We think the government misses the point. Mr. Stewart was denied the opportunity to take over his supervisor's position. The failure to select Stewart as Chief clearly had materially adverse consequences for his present and future employment opportunities. He was simply denied his supervisor's job. Because of the equality of pay and benefits, we may call it a lateral transfer, but in reality, it is more similar to a denial of a promotion – which is clearly an adverse employment action.

Just as withdrawing an employee's supervisory duties constitutes an adverse employment action, *see Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2001), so too failing to select an employee for a position with substantially greater supervisory authority is an adverse employment action. As stated above, in *Brown* we recognized that while generally lateral transfers, or the denial of them, could not be considered adverse employment actions, there are circumstances where they could be. 199 F.3d at 457. What sets this case outside the norm is the structure of the SES. Because transfers inside the SES may not result in different pay or benefits, these moves will almost always be viewed as lateral. They are, however, not always truly lateral in all respects. This requested transfer is not. The relationship between the Senior

Litigation Counsel and Chief is not purely horizontal. The record evidence demonstrates that the Chief actively and directly supervises the Senior Litigation Counsel. Uhlmann testified that as Chief he assigned duties to Stewart "including specific management duties, and other initiatives." Uhlmann Dep. 24.[1] Indeed, at oral argument, Government counsel stated affirmatively that "there is a hierarchy" and that "the Chief's job is higher in the hierarchy than Mr. Stewart's." This case, therefore, fits squarely in the qualification in *Brown* that makes the denial of some lateral transfers adverse employment actions. By being denied the transfer to his supervisor's position, Stewart suffered more than harm to his reputation, as the Government argued and the District Court accepted. That harm amounts to "materially adverse consequences affecting the terms, conditions, or privileges of [his] employment or [his] future employment opportunities such that a reasonable trier of fact could conclude [Stewart] has suffered objectively tangible harm." *Brown*, 199 F.3d at 457. We agree with Appellant that the District Court erred in failing to consider his non-selection an adverse employment action.

C.  Stewart's Case under *McDonnell Douglas*

Stewart also challenges the District Court's finding that he failed to rebut the Government's legitimate, nondiscriminatory reason for not selecting him–that Uhlmann was more qualified. We analyze this case under the familiar *McDonnell Douglas* test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case, Appellant must first show that (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; and (3) despite his qualifications he was rejected. *Id.* at 802.

[1] The concurring opinion expresses concern about a lack of record evidence that Stewart's Senior Litigation Counsel position was subordinate to the ECS Chief. To that we simply point to Stewart's application for the Chief position, in which he identifies his immediate supervisor as Stephen P. Solow, then ECS Chief.

Furthermore, Appellant must at least establish that his rejection was not based on "the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Morgan v. Federal Home Loan Mortgage*, 328 F.3d 647, 651 (D.C. Cir. 2003).

If the plaintiff establishes his *prima facie* case, the defendant then bears the burden of producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Id.* If the defendant produces such evidence, *McDonnell Douglas*, "with its presumptions and burdens disappears and the sole remaining issue is discrimination *vel non*." *Id.*

The District Court found the Government's nondiscriminatory reason for hiring Uhlmann over Stewart – that Uhlmann had more managerial experience – persuasive. This, the District Court noted, shifted the burden back to Stewart to provide sufficient evidence such that a jury could find this "proffered reason was a pretext for discrimination." *Pauquin v. National Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1998). The District Court held that appellant offered no evidence to rebut the Government's legitimate, nondiscriminatory reason for selecting Uhlmann. On appeal, the Government maintains that position. Stewart, on the other hand, argues that he is so much more qualified than Uhlmann that a jury could reasonably determine that relying on Uhlmann's qualifications was a pretext for discrimination.

Under the liberal requirements for establishing a *prima facie* case, Appellant has met the burden of *McDonnell Douglas* only as to the first positive elements. *Cones v. Shalala*, 199 F.3d 512, 518 (D.C. Cir. 2000) ("[Plaintiff] established that he was substantively qualified and [the Government] selected a white person."). Here, Stewart has set forth sufficient facts that he is substantively qualified for the job and a white person was selected. A recounting here of Stewart's many qualifications is not required. It is sufficient to note that Stewart, along with Deborah Smith, the Deputy Chief of ECS, and Uhlmann were the final three candidates

for the Chief position. Sobeck Dep. 38. Stewart has rebutted two common legitimate reasons for not being selected, an "absolute . . . lack of qualifications or the absence of a vacancy in the job sought." *Morgan*, 328 F.3d at 651.

The Government responds that its selection of ECS Chief was based on its observations of Stewart's performance and determinations that Uhlmann was more qualified. Uhlmann took a more keen interest in management. Several parties testified that, although Stewart was a part of management, he rarely attended management meetings. Ms. Smith, Deputy Chief of ECS, testified that prior ECS Chiefs "express[ed] frustration from time to time that [Stewart] wasn't there more often" at management meetings, or otherwise involved in management of ECS. Smith Dep. 35. *See also* Sobeck Dep. 84 (Stewart "had shown little interest or initiative in administrative or leadership matters"); Uhlmann Dep. 14 (Stewart "wasn't a particularly active member or participant in [management] meetings, and my sense was, he frequently absented himself").

The Government also points to the application process. Uhlmann prepared a 21-page application explaining his vision for ECS in terms of detailed goals. In addition, with each goal he proposed for ECS, he explained how his qualifications would enable him to make the goal a reality. Stewart's application, on the other hand, was largely a reproduction of a 1995 memorandum sent by Schiffer to the SES board regarding Stewart's Executive Core Qualifications. Reading the Schiffer memorandum and Stewart's application together, it is clear that much less effort and thought went into it than the Uhlmann application. The Stewart application caused "great concern" to Schiffer, and others, as "a piece of writing." Schiffer Dep. 161. Additionally, as detailed below, Stewart's qualifications were simply not superior to Uhlmann's so as to create an inference that the Government's selection of Uhlmann was based on any discriminatory reason.

Having set forth a nondiscriminatory reason for Uhlmann's selection, *McDonnell Douglas*, "with its presumptions and

burdens disappears and the sole remaining issue is discrimination *vel non*." *Morgan*, 328 F.3d at 651. The question then becomes whether a reasonable finder of fact could determine that the Government's "proffered reason was a pretext for discrimination." *Pauquin*, 119 F.3d at 27-28.

This case is about a dispute over job qualifications. On that issue, our decision in *Aka v. Washington Hospital*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*), is instructive. In that case, the plaintiff had made out a *prima facie* case of discrimination under *McDonnell Douglas* and refuted the employer's proffered nondiscrimination reasons. Aka's qualifications were quite superior to those of Valenzuela, the candidate the hospital selected for a pharmaceutical job. In the pharmaceutical area, Aka had nineteen years of professional experience, versus Valenzuela's two months of volunteer work. Aka had earned two degrees, while Valenzuela had earned none. Stewart's evidence presents no such stark superiority of credentials over those of the successful candidates.

As a threshold matter, Stewart, a highly regarded litigator who has handled very complex environmental litigation, incorrectly and perhaps wishfully, states that litigation experience is the most critical trait to be Chief of ECS. The Government takes the position that while litigation experience is required, management experience is the most critical. Specifically, the DOJ required the Chief to have: experience in managing complex organizations, creating training programs, establishing and prioritizing enforcement initiatives, and developing ECS policy. It is clear Uhlmann had these skills and Stewart lacked them. Because courts are not "super-personnel department[s] that reexamine[ ] an entity's business decision[s]," we defer to the Government's decision of what nondiscriminatory qualities it will seek in filling the Chief position. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

Turning to the comparison of qualifications that Stewart presents, he was simply not discernibly better than Uhlmann. Stewart relies heavily on the fact that he was already an SES employee, whereas Uhlmann was not. While this is true, it

says little about the level of relative qualifications between the two men to serve as Chief. Indeed, Uhlmann was immediately accepted into the SES when he was recommended. Stewart, in accordance with his view that litigation experience should be the driving factor, argues that he has more extensive prosecutorial experience than Uhlmann. While the record does reveal that Stewart had more prosecutorial experience in environmental matters, Uhlmann also had substantial experience as a prosecutor, with over 25 jury trials to his credit. Stewart essentially argues that these don't really count, because 20 of them were in District of Columbia Superior Court and did not involve environmental matters. We don't find Stewart's detailed challenges to the substance of Uhlmann's particular trials persuasive. The Government looks at trial experience as one factor in selecting the Chief, and both Uhlmann and Stewart had prosecutorial experience. The fine distinctions over the substance of those trials are not sufficient to give rise to suspicion of pretext or a jury finding of discrimination. Had Uhlmann never tried a case, perhaps we would have to look further, but that is simply not what occurred here. Schiffer testified that he was "highly regarded by the Solicitor General's Office." Schiffer Dep. 159. This is no small indication of his ability as a litigator. Additionally, prior to his selection as Chief, he served for two and a half years as Assistant Chief of the division, a position that provided him with substantial management and leadership experience in ECS.

Stewart also states he is better prepared to work with the various United States Attorney's offices around the country, owing to his two years of service as an AUSA in the Eastern District of Pennsylvania. In this realm, he challenges Uhlmann's relative inexperience – only six months as an AUSA as part of a DOJ training program. Again, like Stewart's detailed testing of Uhlmann's trial experience, these distinctions are too fine to make Uhlmann's selection questionable. Both Stewart and Uhlmann had served as AUSAs, and an 18-month longer tour for Stewart does not set him that far ahead of Uhlmann.

In discussing a Court's review of an employer's decision to promote based on superior qualifications, this Court stated:

> We must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone. In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualification of the candidates, or that the employer made a judgment call.

*Aka*, 156 F.3d at 1294. The selection of ECS Chief necessarily depends on "assessing the significance of small differences in the qualifications" and making "a judgment call." *Id*. Based on this framework, Stewart's pointing to differences in qualifications that merely indicate a "close call" does not get him beyond summary judgment. This Court will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision.

Finally, we address Stewart's argument that the Government used his involvement in a faction at ECS as a pretext for discrimination. Apparently, during a period in the mid–1990s, ECS had serious personnel problems resulting in balkanization of the office. While the parties do not fully explain the problems involved, it is sufficient to note that it involved competing interests by groups inside ECS and was serious enough to affect the ECS's dealings with other agencies. Stewart asserts that his membership in one of the factions provided Schiffer and the Government with the original reason for not selecting him as Chief. Stewart claims, however, that this is self-contradictory, as Schiffer has subsequently selected Chiefs who were involved in the infighting, including Uhlmann. According to Stewart, this proves that relying on his involvement in a faction as a grounds for denying him the position is a pretext. This argument fails. Stewart points to nowhere in the record where Schiffer

15

contradicts herself. He merely assumes that it would be a contradiction for her to not select him partly based on the fact that he was involved in Section infighting, yet select someone who was also involved. The record does not provide any force to Stewart's argument. First, Schiffer did not rely solely on Stewart's involvement in the infighting as a reason for not selecting him. Furthermore, it appears that anyone in ECS at the time of the factionalization would be identified with some aspect of it. Uhlmann, according to Schiffer's testimony, was never identified with the more intense factional activity.

Lastly, there is a complete lack of evidence in the record that indicates race was a factor in the selection of Uhlmann as Chief of ECS. The only evidence Stewart offers is the testimony of Nadira Clark, an administrative assistant to Schiffer. This testimony is wholly unpersuasive. When asked if she thought race was a factor, Ms. Clark testified that "I don't know. I don't know. I can't speculate one way or another about that. I guess what I would say is that . . . any selection of a minority candidate . . . is always going to be scrutinized a little bit more. . . ." Clark Dep. 33-34. She further testified that Schiffer was "very interested in finding minority candidates for management positions." *Id*. at 80. Clarke's testimony, in whole, is unpersuasive and admittedly based on speculation. It would not support a jury finding of liability.

III. Conclusion

Stewart's claims regarding the Solow selection as ECS Chief are dismissed, as they were not timely filed. While the District Court erred in determining that Stewart's nonselection as Chief of ECS was not an adverse employment action, it was correct in concluding that Stewart did not rebut the Government's legitimate, nondiscriminatory reason for his nonselection. Stewart simply presented no evidence showing that the Government's nondiscriminatory reasons for selecting Uhlmann were pretextual. Furthermore, the record shows no evidence that race played a factor in Stewart's non-

selection. Therefore, the judgment of the District Court is affirmed.

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

I concur in the majority opinion's disposition and, for the most part, in its reasoning. I disagree, however, with its conclusion that Howard P. Stewart suffered an "adverse employment decision"—a necessary element of an employment discrimination claim—when he was not selected to be Chief of the Environmental Crimes Section in the United States Department of Justice.

In *Brown v. Brody,* 199 F.3d 446 (D.C. Cir. 1999), we announced the "rule" that an employee like Stewart who is simply "denied a lateral transfer—that is, one in which [ ]he suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of [his] employment or [his] future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered *objectively tangible* harm." 199 F.3d at 452 (emphasis added). There is no evidence in this record to support a finding of "objectively tangible harm." Stewart argues, without elaboration, that the Chief job "carried with it significantly elevated supervisory duties and responsibilities," Appellant's Br. at 13; *see also id.* at 14 (Chief position "by its very nature carried tremendous supervisory and managerial responsibilities"); *id.* at 15 (Stewart "applied for a position that would have given him a more distinguished title and greater supervisory responsibilities"); *cf.* 211 F. Supp. 2d at 174 ("plaintiff asserts that these losses stem directly from the defendant's failure to promote him to a position that carries 'significantly elevated duties and responsibilities' ") (record citation omitted). He fails to explain, however, how the responsibilities are "elevated" over his own. His bare allegations may reflect Stewart's "own subjective interest" in the position of Chief. *See* 211 F. Supp. 2d at 175. They do not support a finding of objectively tangible harm.[1]

---

[1] Stewart's complaint alleged in addition that he suffered "damage to his career and to his professional and personal reputation, embarrassment, humiliation, and emotional pain." Compl. ¶ 14. These intangible harms are plainly not actionable. *See Stewart v. Evans,* 275 F.3d 1126, 1136 (D.C. Cir. 2002) ("public humiliation or

As evidence that Stewart's position was subordinate to the Section Chief's, the majority opinion states that Chief Uhlmann "testified that as Chief he assigned duties to Stewart 'including specific management duties, and other initiatives.'" Maj. Op. at 8–9 (quoting Uhlmann Dep. at 24). Uhlmann testified that during his tenure Stewart "ha[d] continued to serve as ... the reviewing official for [the Section's] legal support staff," as he had done before Uhlmann became Chief. *Id.* Uhlmann further stated he had asked Stewart "to meet with all the trial teams in the section after cases were charged, to work with their assistant chiefs, and to work with them on formulating trial strategy," and "to participate in every management meeting." *Id.* at 24–25. To me, this testimony does not reflect the kind of supervisory hierarchy that the majority opinion suggests.[2]

In pressing his claim of adverse employment action, Stewart relies heavily on *Burke v. Gould*, 286 F.3d 513 (D.C. Cir. 2002), in which the court concluded a government employee suffered an adverse employment action when he "was relieved of his supervisory responsibilities as section chief and assigned to unspecified duties." 286 F.3d at 516. To *lose* supervisory authority through a job change is a far cry from failing to acquire *different* supervisory authority through non-selection. It is undisputed that Stewart has long exercised supervisory responsibilities over junior lawyers in his current position. *See* 211 F. Supp. 2d at 175 ("plaintiff himself acknowledges that in his current position as Senior Litigation Counsel, he has had years of experience supervising other attorneys"). These responsibilities may be different in kind

---

loss of reputation does not constitute an adverse employment action under Title VII").

[2] I ascribe little weight to the conclusionary support the majority cites for the proposition that the Chief was Stewart's supervisor, *see* Maj. Op. at 8 & n.1, namely the government's non-record "hierarchy" comments at oral argument and Stewart's own, self-serving characterization of the Chief as his "supervisor," *see also* Schiffer Dep. at 165–66 (also calling Chief Stewart's "supervisor"). They tell us nothing specific about the relationship between the Chief's position and Stewart's.

from those attendant upon the Chief's position but such differences as exist do not negate the fact that Stewart's current position entails supervisory responsibility or make the position inferior to the Chief's.

In sum, while I agree with the majority opinion that no reasonable juror could find the defendant's legitimate, nondiscriminatory reason for not selecting Stewart in 2000 was pretextual, I do not believe we need reach pretext. I would affirm the summary judgment with regard to Stewart's non-selection in 2000 on the ground that Stewart failed at the prima facie stage to show that he suffered an adverse employment action. In all other respects, I concur in the majority opinion.