ROGERS, Circuit Judge,
dissenting:
Contrary to the court’s suggestion, Kevin L. Jackson’s appeal does not ask the court to micromanage a personnel decision. See Op. at 707, 708-09. Instead Jackson presents a question that goes to the heart of Title VII and the federal civil service system. The court chooses to ignore this fact by casting the case in terms of who was more qualified for a promotion. See id. at 705. However, Jackson’s appeal is based on evidence suggesting that the employer’s asserted nondiscriminatory reason for selecting another candidate was fabricated to mask unlawful discrimination. “Credibility determinations [and] the weighing of the evidence” are functions of the trier of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. P. 56(c). Accordingly, because summary judgment was inappropriate, I would remand the case to the district court for further proceedings.
I.
Title VII is aimed at protecting victims of unlawful discrimination. See, e.g., Landgraf v. USI Film Prods., 511 U.S. 244, 254, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). The federal civil service system serves a complimentary purpose as it is designed to afford equal opportunity by requiring job announcements and job descriptions to set forth the job requirements and selection to be based on the listed requirements, and not on an unmentioned consideration. See 5 U.S.C. § 2301(b); Nat’l Treasury Employees Union v. Horner, 854 F.2d 490, 492 (D.C.Cir. 1988); Nat’l Treasury Employees Union v. U.S. Customs Serv., 802 F.2d 525, 529 (D.C.Cir.1986). Enacted in 1833, the Pen-dleton Act, 22 Stat. 403, “replace[d] the ‘spoils system,’ under which the President could dispense federal jobs as rewards for political patronage, with a ‘merit system’ that would base selection and promotion of most civil servants on competence.” Frazier v. Merit Sys. Protection Bd., 672 F.2d 150, 153 (D.C.Cir.1982); see Sampson v. Murray, 415 U.S. 61, 71, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). Subsequent legislation furthered Congress’s objective of establishing an efficient and competent civil service and providing greater statutory protections for federal employees. The Civil Service Reform Act (“CSRA”), enacted in 1978, restructured the federal civil service in order to “promote a more efficient civil service while preserving the merit principle in Federal employment.” Developments in the Law — Public Employment, 97 Harv. L. Rev. 1611, 1632 & n. 3 (1984) (quoting S. Rep. No. 969, 95th Cong., 2d Sess. 1, at 2 (1978), reprinted in 1978 U.S. Code Cong. & Ad. News 2723). To this end, the CSRA provides that “[federal personnel management should be implemented consistent with” several “merit system principles,” which provide, among others, that “advancement should *711 be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity.” 5 U.S.C. § 2301(b); see Horner, 854 F.2d at 492; U.S. Customs Serv., 802 F.2d at 529. Under regulations promulgated by the Office of Personnel Management, which supervises the administration of the civil service system, Frazier, 672 F.2d at 154; see 5 U.S.C. § 1302, all federal agencies, including the Bureau of Prisons (“BOP”) in the Department of Justice, are required to provide a notice of job announcement for competitive positions that includes the position’s “[qualification requirements, including knowledges [sic], skills, and abilities.” 5 C.F.R. § 330.707(b)(5).
Jackson proffered evidence that in March 2001, when he applied for a GS-14 social science research analyst position, the evaluation board gave him a score of 98 out of 100, but the BOP Office of Research and Evaluation (“ORE”) never filled that position. At the time, the ORE had no African-Americans in GS-13, GS-14, or GS-15 positions. Six months later ORE announced another GS-14 social science research analyst position. This job announcement asked each applicant to address in his or her application six categories of Knowledge, Skills, and Abilities (“KSAs”)[1] “in a ... manner which will enable [the BOP] to make a reasonable determination about qualifications.” Job Announcement at 1-2. The announcement made no reference to experience with the Key Indicators Strategic System (“Key Indicators”) [2] as a requirement. The job description included a more detailed description of the “KNOWLEDGE AND SKILLS REQUIRED BY THE POSITION,”[3] but it also made no reference to Key Indicators experience. Jackson applied for the position, as did six other individuals, including Jennifer Batchelder, who is Caucasian. At the time of her application, Bat-chelder, like Jackson, was a GS-13 social science research analyst, who had received outstanding performance evaluations from her supervisor, as Jackson had from his, *712 but her principal work involved programming and collecting and processing data for use by others to carry out research. According to Thomas Kane, the BOP Assistant Director, Batchelder’s work “focus[ed] more on statistical analysis and computer programming [while] Jackson [focused] more on program management and facilitation.” Thomas Kane Dep. at 47 (June 14, 2004). The evaluation board gave Jackson a score of 43 out of 81, and Batchelder a score of 73. Kane, upon being presented only with the recommendation to promote Batchelder, selected her for the GS-14 position.
In response to Jackson’s Title VII lawsuit, the two persons in the BOP who had evaluated the applications claimed in sworn statements that they had relied on Batchelder’s work on Key Indicators in awarding her significantly higher KSA scores than the other applicants. Batchel-der’s application referred to articles that she had written for staff and users of Key Indicators but, unlike Jackson, Batchelder did not identify any papers that she had published, although she had written the introduction for a publication. By contrast, the evaluators justified Jackson’s lower KSA scores by emphasizing the narrow nature of his work projects and technical problems with his statistical research in the papers he authored, including his masters thesis, which had been published. No mention was made of Jackson’s experience with Key Indicators:
In moving for summary judgment, the Department claimed that Key Indicators experience was the critical consideration in the BOP’s selection of Batchelder: “At the time of the selection consideration, the overriding objective for the [ORE] was to hire someone who could maintain ... the Key Indicators Strategic System.” Defs Mem. Supp. Summ. J. at 17-18 (emphasis added). The Department argued that the evaluators had legitimate, nondiscriminatory “concerns about [Jackson’s] abilities” and properly weighed “Batchelder’s expertise with Key Indicators” in awarding her higher scores. Id. at 18. On appeal, the Department reasserts that “[a]t the time of the selection consideration, the overriding objective for the [ORE] was to hire someone who could maintain [ORE’s] essential and most important function — i.e., the Key Indicators Strategic System.” Appellee’s Br. at 21 (emphasis added). In support, the Department points to the deposition of William Saylor, who was one of the evaluators, stating that his “concern was to make certain” to hire “someone who had the skill set that would be needed to keep th[e] key indicators application functional.” William Saylor Dep. at 147 (June 23, 2004).
II.
Common sense would suggest that if Key Indicators experience was the “overriding objective” underlying the selection of the GS-14 research analyst position, then the BOP would have mentioned that qualification in announcing and describing the job to ensure that it would receive applications from candidates with the desired experience and thus be in a position to select the candidate most qualified to maintain Key Indicators. Jackson, however, does not contend that the general nature of the job description alone creates an inference of discrimination sufficient to overcome summary judgment. Rather, Jackson contends that the inconsistency between the descriptions in the job announcement and description, on the one hand, and the evaluators’ post-hoe reasons for the selection, on the other, raises an inference sufficient to preclude summary judgment. It is the specific centrality of Key Indicators experience — tardily so claimed by the Department — that contra- *713 diets the general job description and the evaluators’ explanations of Jackson’s low scores, neither of which mentions Key Indicators experience. Given the emphasis the Department placed on Key Indicators experience after the fact, and according Jackson as the nonmoving party all reasonable inferences, as the court is required to do, see Anderson, 477 U.S. at 255, 106 S.Ct. 2505; Shekoyan v. Sibley Int’l, 409 F.3d 414, 422-23 (D.C.Cir.2005) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)), “a reasonable juror could conclude that [the BOP] would have included this qualification in the job listing had it honestly believed that it was of primary importance for the new position.” Courtney v. Biosound, Inc., 42 F.3d 414, 421 (7th Cir.1994) (emphasis added) (citing Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1225 (2d Cir.1994)).
Although a decision to promote, like a hiring decision, may involve a “dynamic” process, Nichols v. Lewis Grocer, 138 F.3d 563, 568 (5th Cir.1998), dynamism cannot serve as an excuse for failing to adhere to the underlying purposes of the federal civil service system — to ensure equal opportunity and fair and open competition — by allowing the process to “drift” in its employment objective without raising an inference, given Jackson’s evidence, that such inconsistency could mask unlawful discrimination. Put otherwise, Jackson’s contention is that he presented evidence, including the absence of African-Americans from high-level positions at the BOP and the BOP’s failure several months earlier to fill another GS-14 research analyst position for which he had received a score of 98 out of 100, from which a reasonable inference of unlawful discrimination may be drawn. The Department does not challenge the district court’s finding that Jackson had established a prima facie case of discrimination. In contending that he also has shown that the Department’s explanation was pretex-tual, Jackson is not relying merely on the fact that the BOP based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description, see Op. at 709, but rather on the undisputed evidence that Key Indicators experience is not mentioned in the job announcement, the job description, or the evaluators’ explanations of Jackson’s low KSA scores, all of which conversely reflect a primary focus on research.[4]
The court treats this case as involving the question of who as between Jackson and Jennifer Batchelder was more qualified for the GS-14 position. See id. at 711, 707-08. It states the evidence in the light most favorable to the Department, accepting the Department’s tardy explanation that Key Indicators experience was the “overriding objective” as an established, *714 undisputed fact. See id. at 705- 06. Upon acknowledging that a Title VII plaintiff may prevail by showing that an employer’s qualification-based explanation “is incorrect or fabricated,” id. at 707 (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1295 (D.C.Cir.1998) (en banc)), the court dismisses Jackson’s evidence as showing only that the evaluators could have given him higher KSA scores. See id. By treating this case as simply a matter of the BOP choosing the more qualified applicant, see id. at 707-08, however, the court ignores the material issue of disputed fact raised by Jackson’s evidence that goes directly to the question of what type of applicant BOP actually sought in announcing the GS-14 research analyst position — a research analyst with the announced skills and experience or a computer programmer with Key Indicators experience?
The court’s efforts to bolster its holding do not withstand examination. First, the court relies on the district court’s conclusion that Key Indicators skills are a component of the skills listed for the GS-14 position. See id. at 708. However, this is not the same as the Department’s proffered nondiscriminatory explanation that Key Indicators skill was the “overriding” requirement for the research analyst position. Some of the categories of “KNOWLEDGE AND SKILLS” listed in the job description refer to statistical and computing skills, including familiarity with “mainframe and micro computer software,” Position Description at 2, but none mentions Key Indicators experience. Instead, the job description focuses on research skills and responsibilities. Thus, the job description does not support the Department’s contention that specific expertise in Key Indicators was the decisive requirement for filling the GS-14 research analyst position.
Second, the court observes that “job descriptions are often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors.” Op. at 708. True but irrelevant. The court ignores two undisputed facts. One, the BOP’s job announcement and description set forth the qualifications and nature of the position. The job announcement outlines the “DUTIES” of the position, lists three categories of required “SPECIALIZED EXPERIENCE,” and lists six “KSAs.” Job Announcement at 1, 2. The job description sets forth the incumbent’s three major responsibilities, the particular emphasis of the studies that the GS-14 researcher will conduct, the manner in which the research will be used by BOP’s Executive Staff and by top management in the Federal Sentencing Commission and other agencies, and other objectives of the incumbent’s research. The job description also includes two paragraphs explaining the “MAJOR DUTIES AND RESPONSIBILITIES” and includes a page-long listing of “KNOWLEDGE AND SKILLS REQUIRED BY THE POSITION,” see supra note 3, and two-and-a-half additional pages of description of various aspects of the position’s responsibilities, including research guidelines, the complexity of the research projects, and the “SCOPE AND EFFECT OF THE WORK.” Job Description at 1, 2, 4. Nowhere in the job announcement or the description is Key Indicators experience mentioned. Two, the evaluators’ explanations for giving Jackson low scores make no mention of his Key Indicators experience or lack thereof and thus undercut the tardily claimed primacy of Key Indicators experience. The evaluators’ preoccupation with Jackson’s research abilities — with inconsistent reliance on Key Indicators experience in grading Jackson’s and Batchelder’s applications — undermines the Department’s *715 claim that expertise in Key Indicators was the “overriding consideration” for the selection.
Reasonable employers may not “ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by [a] written job deseription[ ],” Op. at 709 (quoting Aka, 156 F.3d at 1297 n. 15), but a reasonable jury could conclude that neither would a reasonable employer neglect to mention the single most important requirement in the job announcement, job description, and explanation of an applicant’s low scores. If Key Indicators experience was as crucial to the GS-14 research analyst position as the Department now claims, then a juror could reasonably expect it to be mentioned by the job announcement and description, much less in the evaluators’ explanations of Jackson’s low scores. How else could the BOP ensure, consistent with the purposes of the federal civil service system, that it would receive applications from the most qualified persons and be in a position to select the most qualified individual to carry on the Key Indicators work? Here, the job announcement and description did not refer to Key Indicators experience and there is a disconnect between Saylor’s assertions of Key Indicators’ primacy and the evaluators’ explanations of Jackson’s scores. This evidence raises the question of Saylor’s credibility as to whether Key Indicators experience was the “overriding” requirement of the GS-14 social science research analyst position at the time of the selection. A credibility determination is the domain of the trier of fact, see Anderson, 477 U.S. at 255, 106 S.Ct. 2505, and raises a genuine issue of material fact as to the Department’s asserted nondiscriminatory reason for selecting Batchel-der, making summary judgment inappropriate. In other words, from the absence of any mention of Key Indicators experience in the announcement and description of the GS-14 position and in the explanations of Jackson’s low scores, a reasonable juror could conclude that Saylor’s assertion that Key Indicators experience was the central criterion underlying the ORE’s desire to fill the GS-14 research analyst position was fabricated.
The conclusion that Jackson has raised a genuine issue of material fact in no way requires the court to “second-guess an employer’s initial choice of appropriate qualifications” or contravene the principle that “courts ‘defer to the [employer’s] decision of what nondiscriminatory qualities it will seek’ in filling a position.” Op. at 709 (quoting Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C.Cir.2003)). Neither does it mean that employers would be required to “publish [] contemporaneous statements] of reasons every time they make a hiring or firing decision.” Id. at 710. It means only that, in accordance with the requirements of the federal civil service, an employer must provide notice to prospective job applicants of the relevant skills and requirements on- which it intends to rely in makr ing a decision. Jackson is not challenging the qualifications that the ORE found necessary for the GS-14 research analyst position, but instead he is challenging whether the qualification now claimed to be the “overriding consideration” actually did play such a central role in the selection process or whether BOP manufactured this justification after selecting Batchelder. That a reasonable trier of fact could accept the Department’s explanation by crediting Saylor is not, as the court appears to assume, see id. at 709-10, the standard for summary judgment. See Anderson, 477 U.S. at 252, 106 S.Ct. 2505.
None of the cases cited by the court, or the district court, reach a contrary conclusion and all are factually distinguishable. For example, in Davis v. Ashcroft, 355 F.Supp.2d 330 (D.D.C.2005), the job an *716 nouncement did not “list the requisite qualifications for the position,” id. at 340— unlike the BOP’s job announcement and description, which listed a series of qualifications and required skills but failed to mention Key Indicators experience — and the plaintiff challenged “the soundness” of using the disputed factor as a qualification for a position, not whether the factor had in fact been used, see id. at 342-43. Jackson is not disputing the utility of Key Indicators experience as a qualification but rather the Department’s claim that Key Indicators skill was in fact the critical qualification for the research analyst position. Neither is Jackson contesting the Department’s evaluation of specific employment criteria; instead he relies on an inconsistency between the job description and the “overriding objective” that the Department claims in litigation was the decisive factor in the selection process but was omitted from the job description and his evaluation.
Because the timing of the Department’s emphasis on the centrality of Key Indicators experience for the GS-14 research analyst position defines this case, and not whether the Department “changed the importance of the criteria [it] used in the selection process,” Lee v. GTE Fla., Inc., 226 F.3d 1249, 1255 n. 2 (11th Cir.2000), this case also differs from Lamb v. Boeing Co., 213 Fed.Appx. 175 (4th Cir.2007) (unpublished opinion), and Browning v. Department of the Army, 436 F.3d 692 (6th Cir.2006). See Op. at 709-10. In Lamb, the plaintiff offered “no evidence” of pretext aside from the absence of the disputed criteria from the job description, Lamb, 213 Fed.Appx. at 179-80, while Jackson points to more, see supra at 707. In Browning, the plaintiff was on notice that the employer considered the disputed factor to be an important qualification and instead challenged the weight given to an employment criterion identified in “both the job description and the matrix” designed to evaluate applicants. Browning, 436 F.3d at 696-97. Jackson, however, has proffered evidence of a disconnect between the Department’s post-hoc justification for the selection and “[w]hat [the Department] intended when it advertised this position,” Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1227 (2d Cir.1994), thus, distinguishing this case from cases such as Holcomb v. Powell, 433 F.3d 889, 897-99 (D.C.Cir.2006), in which the court deferred to the employer’s weighing of the candidates’ qualifications and found inadequate evidence to support the plaintiffs contention that the employer had misstated her qualifications, and Stewart v. Ashcroft, 352 F.3d 422, 429-30 (D.C.Cir.2003), in which the court deferred to the employer’s comparison of the candidates’ qualifications and the employer’s determination of the skills necessary for the position.
As the court observed in Lathram v. Snow, 336 F.3d 1085 (D.C.Cir.2003), a “plaintiffs discrediting of an employer’s stated reason for its employment decision is entitled to considerable weight” in establishing a material factual dispute regarding unlawful discrimination. Id. at 1089 (quoting Aka, 156 F.3d at 1290). While courts must “be sensitive to the necessary and appropriate realities of hiring processes,” Op. at 709, courts cannot ignore, in determining whether summary judgment is appropriate, evidence that raises a material question of fact and be so deferential as to allow employers to mask unlawful discrimination with post-hoc justifications for employment decisions. Because Jackson has raised a genuine issue of material disputed fact as to the centrality of Key Indicators experience in filling the GS-14 research analyst position, summary judgment for the Department was inappropriate and I would remand the case *717 to the district court for further proceedings. Accordingly, I respectfully dissent.

. The generic KSAs listed in the job announcement were the applicant's: (1) “[ajbility to manage resources”; (2) "[ajbility to communicate [ ] orally”; (3) "[a]bility to communicate in writing”; (4) “[a]bili1y to apply social science research methods”; (5) "knowledge of statistical methods”; and (6) "[a]bility to assign responsibility and delegate authority.” Job Announcement at 2.

. According to one of Jackson's evaluators, Key Indicators is an “elaborate, comprehensive, and technically detailed” data warehousing system. It includes information about all aspects of BOP's operations and provides data to managers in aggregate form as well as statistical and graphic analyses. See Gerald Gaes Dep. at 28-29 (June 11, 2004).

. The posted job description listed on page 2 the following "KNOWLEDGE AND SKILLS”:
—In depth knowledge of correctional programs and BOP operations and a knowledge of Department and Bureau policies and regulations.
—Knowledge of theories in sociology, social psychology, corrections, criminal justice, and criminology.
—Knowledge of research designs....
—Knowledge of an array of research methodologies for the observation and measurement of behavior and attitudes....
—Knowledge of univariate or multivariate mathematical statistical theory and techniques appropriate for particular research designs and methodologies....
—Knowledge of statistical computer programs ....
—Knowledge of IBM CMS Timesharing System, TSO, and OS Batch System.
—Knowledge of mainframe and micro computer software....
—Skill in teaching and supervising research assistants and technicians in the knowledge and techniques necessary for social science research.
—Skill in writing research reports for BOP managers or for distribution in the social science community.

. The job announcement stated that the responsibilities of the position include supervising research analysts and “conducting research on crime and corrections.’’ Job Announcement at 1. Further, "the research the employee conducts contributes to” several fields including, “corrections, criminal justice, criminology, and sociology” and the “[rjesearch will be utilized by the Executive Staff of the [BOP] to study the effectiveness of [BOP] programs and polices and to prescribe prescriptions for improvement.” Id. The job description similarly focuses on research: The incumbent’s primary responsibilities are supervising Ph.D. level research analysts and designing and conducting research that assists the BOP in improving and developing policies and programs and contributes to several fields of knowledge. The job description states that the "MAJOR DUTIES AND RESPONSIBILITIES” involve “formulating] and directing] research that answers questions of interest to the [BOP] administration” and describes the activities involved in the research tasks. Job Description at 1.