# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 19, 2007        Decided August 10, 2007

No. 06-5053

KEVIN L. JACKSON,
APPELLANT

v.

ALBERTO GONZALES, ATTORNEY GENERAL,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01596)

*Debra A. D'Agostino* argued the cause for appellant. On the briefs was *Sandra Mazliah*.

*Beverly M. Russell*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, ROGERS, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Circuit Judge* HENDERSON joins.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAVANAUGH, *Circuit Judge*: Kevin Jackson worked as a GS-13 employee in the Bureau of Prisons. Jackson and six other individuals applied for an open GS-14 research analyst position. The Bureau selected Jennifer Batchelder, a Caucasian woman. Jackson, who is African-American, sued and alleged racial discrimination in violation of Title VII. In its defense, the Bureau said it selected Batchelder because she was more qualified than Jackson. The District Court granted summary judgment to the Bureau, concluding that a reasonable jury could not find the Bureau's explanation a pretext for racial discrimination. We agree with the District Court and therefore affirm.

I

Kevin Jackson, an African-American man, and Jennifer Batchelder, a Caucasian woman, worked as GS-13 employees in the Bureau of Prisons. Both applied for a GS-14 research analyst job at the Bureau, as did five other individuals. A two-person initial evaluation board scored all applicants based on six general qualifications – also called "KSAs," short for "knowledge, skills, and abilities" – and other personal characteristics needed in the job to be filled. J.A. 276.[1] The

_____

[1] The generic KSAs included the applicant's: (1) ability to manage resources; (2) ability to communicate orally; (3) ability to communicate in writing; (4) ability to apply social science research methods; (5) knowledge of statistical methods; and (6) ability to assign responsibility and delegate authority. J.A. 276. The Bureau also posted a more detailed job description, which listed the

board members sought to hire an applicant who had experience with the Bureau's main data management tool, known as the Key Indicators Strategic System, although the job description documents did not expressly refer to Key Indicators experience as a specific qualification (the documents listed more general qualifications). The Key Indicators system includes information about all aspects of the Bureau's operations, such as health care, sentencing issues, and inmate conduct and misconduct. In addition to aggregating the data, the system uses statistical and graphical tools to show how the relevant aspects of the Bureau's operations change over time.

Batchelder received by far the highest numerical score on the KSAs – 52 out of 60 possible points. By contrast, Kevin Jackson received 22 points out of 60, which placed him third among the seven applicants. Batchelder also had significantly more experience than Jackson with the Key Indicators system. Both employees received 15 points for past performance and six points for awards – yielding total scores of 73 points for

---

following skills and knowledge as job requirements: in-depth knowledge of correctional programs and Bureau operations and a knowledge of Bureau policies and regulations; knowledge of theories in sociology, social psychology, corrections, criminal justice, and criminology; knowledge of research designs; knowledge of an array of research methodologies for the observation and measurement of behavior and attitudes; knowledge of univariate or multivariate mathematical statistical theory and techniques appropriate for particular research designs and methodologies; knowledge of statistical computer programs; knowledge of IBM CMS Timesharing System, TSO, and OS Batch System; knowledge of mainframe and micro computer software; skill in teaching and supervising research assistants and technicians in the knowledge and techniques necessary for social science research; and skill in writing research reports for Bureau managers or for distribution in the social science community. J.A. 280.

Batchelder and 43 points for Jackson. Because Batchelder's score was much higher than all the other candidates, the board forwarded only her name to the final decision-maker, Thomas Kane. Kane in turn selected Batchelder for the position.

Jackson then sued, alleging racial discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. In the district court, the Bureau explained that it hired Batchelder because she was better qualified, particularly in light of her extensive experience with the Key Indicators system. The District Court granted summary judgment to the Bureau, stating that Jackson failed to show he was significantly more qualified and that it was "therefore not proper to 'second-guess [the] employer's personnel decision.'" *Jackson v. Gonzales*, No. Civ.A. 03-1596, 2005 WL 3371041, at *11, *13 (D.D.C. Dec. 12, 2005) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)) (alteration in original). The District Court also concluded that the Bureau's reliance on a factor not expressly listed in the job description (Key Indicators experience) did not undermine the Bureau's explanation for its hiring decision because such experience was clearly encompassed by the qualifications listed in the job description. *See id.* at *10 ("[I]t is clear that Key Indicator System skills are a component of the overall skills necessary for the GS-14 position."); *id.* ("[A]lthough not specifically mentioned in the vacancy announcement or job description, the general terms used in these documents clearly indicate a desire on the part of the defendant to hire someone with skills acquired from working with the Key Indicator System.").

On appeal, Jackson argues that there is a genuine issue of material fact regarding whether the Bureau's real reason for not selecting him was racial discrimination. Our review is de novo. *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004).

5

II

Title VII of the Civil Rights Act, as amended, provides that all "personnel actions affecting employees or applicants for employment" in Executive agencies "shall be made free from any discrimination based on race." 42 U.S.C. § 2000e-16(a). "Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), to analyze the claim." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation omitted in part). Although "intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (alteration in original).

The *McDonnell Douglas* framework first requires the plaintiff to establish a prima facie case of discrimination by showing that: "(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone . . . filled the position or the position remained vacant and the employer continued to seek applicants." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (quotation marks omitted and alteration in original). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant employer to produce "'evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 254). "If the defendant satisfies that burden, the *McDonnell Douglas* framework – with its

presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quotation marks and alterations omitted). At that point, the plaintiff can survive summary judgment only by showing "that a reasonable jury could conclude that [he] was terminated for a discriminatory reason." *Id*. To make such a showing, the plaintiff must prove that a reasonable jury could infer that the employer's given explanation was pretextual and that this pretext shielded discriminatory motives. *See Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005).

The Bureau here said it selected Jennifer Batchelder because she was more qualified and had superior Key Indicators experience. When an employer says it made a hiring decision based on the relative qualifications of the candidates, "we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc). On the other hand, if a factfinder can conclude that a "reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate – something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id.*; *see also Holcomb*, 433 F.3d at 897; *Stewart v. Ashcroft*, 352 F.3d 422, 429-30 (D.C. Cir. 2003). Applying *Aka*, we have explained that "[i]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." *Holcomb*, 433 F.3d at 897. To conclude otherwise would be to render the judiciary a "super-personnel department that reexamines an entity's business decisions" – a role we have repeatedly disclaimed. *See*

*id*. (quotation marks omitted).

Here, as the KSA scores indicate, the evidence presented by Jackson does not suggest that he was "significantly better qualified" than Jennifer Batchelder. *Aka*, 156 F.3d at 1294. On the contrary, it plainly suggests that Batchelder was better qualified. To be sure, we have also stated that a plaintiff may present evidence to show that the employer's qualifications-based explanation "is incorrect or fabricated." *Id.* at 1295; *see also Holcomb*, 433 F.3d at 898. Jackson thus alleges certain discrepancies between the candidates' qualifications and the evaluation board's ratings. But it is undisputed that Batchelder had been an outstanding employee at the Bureau; that her experience with the Key Indicators system was substantially superior to Jackson's; that the Key Indicators system was important to the Bureau's operations; and that Batchelder received by far the highest KSA scores of any candidate who applied for the job.

Jackson's evidence at most shows that the evaluators could have given him somewhat higher scores and Batchelder somewhat lower scores than they did. That is not enough, however, to demonstrate that the Bureau's reliance on comparative qualifications was a pretext for discrimination: "This Court will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision." *Stewart*, 352 F.3d at 430. Like the plaintiff in *Stewart*, Jackson "was simply not discernibly better" than the candidate promoted. *Id.* at 429.

Jackson also contends that a reasonable jury could disbelieve the Bureau's reliance on Batchelder's superior Key Indicators experience as the overriding factor because the job

description documents did not *expressly* refer to Key Indicators knowledge or experience. Although this argument may present a closer question given the somewhat unusual facts of this case, we agree with the District Court that the evidence presented by Jackson does not create an inference of discrimination sufficient to overcome summary judgment.[2]

To begin with, as the District Court correctly recognized, Key Indicators experience was clearly encompassed by the qualifications listed in the job description. *See Jackson*, 2005 WL 3371041, at *10 (noting that Bureau sought applicants with ability to use statistics to describe and predict trends in Bureau data). Indeed, Key Indicators experience was directly relevant to at least two of the KSAs set forth in the generic vacancy announcement: ability to manage resources, and ability to assign responsibility and delegate authority. In addition, the more detailed list of qualifications set out in the position description included "[k]nowledge of statistical computer programs" and "computer software," and thus plainly encompassed Key Indicators experience. J.A. 280.

As we have explained before, moreover, job descriptions are

---

[2] The dissenting opinion appears to suggest that Jackson's case survives summary judgment in part because the Bureau lacked high-level African-American employees. *See* Dissenting Op. at 2-3, 7. But Jackson never made such an argument either before the District Court in opposing summary judgment or before this Court on appeal. On the contrary, Jackson has consistently maintained that "[t]he material factual dispute here is rooted in the *two employees'* respective performance histories and qualifications." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 14 (emphasis added). *Cf. Aka*, 156 F. 3d at 1295 n.11 ("For instance, if a female plaintiff claims sex discrimination, evidence that the defendant employs women at rates far below their numbers in the applicant pool and the general population may well help her case.").

often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors – such as their strategic priorities and goals at the time, the strengths and weaknesses of the applicant pool, and the overall skills of and gaps in their existing workforce, among many other factors. We have said that courts must not second-guess an employer's initial choice of appropriate qualifications; rather the courts "defer to the [employer's] decision of what nondiscriminatory qualities it will seek" in filling a position. *Stewart*, 352 F.3d at 429; *see also Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) ("Questioning [the employer's] hiring criteria is not within the province of this court . . . ."). Particularly given the dynamic nature of the hiring process, moreover, we have also stated that we will not second-guess how an employer weighs particular factors in the hiring decision. *See Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) ("[C]ourts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily."). Indeed, we have even said that an employer may select "a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview" – although we are of course cautious in accepting such purely subjective explanations when the plaintiff otherwise is "significantly better qualified." *Aka*, 156 F.3d at 1294 & n.10.

In *Aka*, we explained that courts must be sensitive to the necessary and appropriate realities of hiring processes. Reasonable employers, we said, "do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job." *Id.* at 1297 n.15. Other courts of appeals have reached the same conclusion. *See Lamb v. Boeing Co.*, 213 F. App'x 175, 180 (4th Cir. 2007) ("Title VII does not impose the impracticable obligation of anticipating and recording before the fact a

company's valuation of every credential with which it might be presented, and we cannot sanction the inference that the credentials upon which the hiring managers said they relied were pretexts merely because they were not listed in advance."); *Browning*, 436 F.3d at 696-97 ("employers are *not* rigidly bound by the language in a job description"; employer's "decision to weigh administrative/managerial experience more heavily than the job description suggested [was] simply not sufficient to demonstrate" falsity of employer's qualifications-based explanation); *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1255 n.2 (11th Cir. 2000) (evidence that employer "changed the importance of the criteria he used in the selection process" did not tend to show that employer's asserted nondiscriminatory explanation was false); *Nichols v. Lewis Grocer*, 138 F.3d 563, 568 (5th Cir. 1998) (hiring decisions are "dynamic," and "relative importance placed on various selection criteria cannot be expected to remain fixed and unyielding" throughout the process).

All of these various formulations and precedents establish a clear principle for purposes of this case: The fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment. Indeed, we are aware of no previous case from this or any other circuit suggesting that an employee gets past summary judgment simply by showing that a factor in the hiring decision was not *expressly listed* in the job description when the factor was *encompassed* by the job description. Therefore, Jackson cannot overcome summary judgment on this basis.

Finally, we do not agree with Jackson that the timing of the Bureau's explanation of its hiring decision somehow casts doubt on the credibility of that explanation and therefore is evidence of

pretext. Before Jackson commenced this employment discrimination suit, the Bureau simply had no occasion to explain its decision to hire Batchelder; rather, the first time the Bureau had to explain that decision was in defending this case. The Bureau's explanation therefore cannot be considered "post-hoc" or "tardily" asserted. *Cf.* Dissenting Op. at 6, 12-13. To suggest otherwise is essentially to direct employers to publish a contemporaneous statement of reasons every time they make a hiring or firing decision – a requirement that Title VII has never been understood to impose.

## III

We affirm the District Court's grant of summary judgment to the Bureau of Prisons.

*So ordered*.

ROGERS, *Circuit Judge*, dissenting: Contrary to the court's suggestion, Kevin L. Jackson's appeal does not ask the court to micromanage a personnel decision. *See* Op. at 6, 9. Instead Jackson presents a question that goes to the heart of Title VII and the federal civil service system. The court chooses to ignore this fact by casting the case in terms of who was more qualified for a promotion. *See id.* at 2. However, Jackson's appeal is based on evidence suggesting that the employer's asserted nondiscriminatory reason for selecting another candidate was fabricated to mask unlawful discrimination. "Credibility determinations [and] the weighing of the evidence" are functions of the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); FED. R. CIV. P. 56(c). Accordingly, because summary judgment was inappropriate, I would remand the case to the district court for further proceedings.

## I.

Title VII is aimed at protecting victims of unlawful discrimination. *See, e.g.*, *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 254 (1994) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-422 (1975)). The federal civil service system serves a complimentary purpose as it is designed to afford equal opportunity by requiring job announcements and job descriptions to set forth the job requirements and selection to be based on the listed requirements, and not on an unmentioned consideration. *See* 5 U.S.C. § 2301(b); *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988); *Nat'l Treasury Employees Union v. U.S. Customs Serv.*, 802 F.2d 525, 529 (D.C. Cir. 1986). Enacted in 1833, the Pendleton Act, 22 Stat. 403, "replace[d] the 'spoils system,' under which the President could dispense federal jobs as rewards for political patronage, with a 'merit system' that would base selection and promotion of most civil servants on competence." *Frazier v. Merit Sys. Protection Bd.*, 672 F.2d

150, 153 (D.C. Cir. 1982); *see Sampson v. Murray*, 415 U.S. 61, 71 (1974). Subsequent legislation furthered Congress's objective of establishing an efficient and competent civil service and providing greater statutory protections for federal employees. The Civil Service Reform Act ("CSRA"), enacted in 1978, restructured the federal civil service in order to "promote a more efficient civil service while preserving the merit principle in Federal employment." *Developments in the Law — Public Employment,* 97 HARV. L. REV. 1611, 1632 & n.3 (1984) (quoting S. REP. NO. 969, 95th Cong., 2d Sess. 1, at 2 (1978), *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 2723). To this end, the CSRA provides that "[f]ederal personnel management should be implemented consistent with" several "merit system principles," which provide, among others, that "advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b); *see Horner*, 854 F.2d at 492; *U.S. Customs Serv.*, 802 F.2d at 529. Under regulations promulgated by the Office of Personnel Management, which supervises the administration of the civil service system, *Frazier*, 672 F.2d at 154; *see* 5 U.S.C. § 1302, all federal agencies, including the Bureau of Prisons ("BOP") in the Department of Justice, are required to provide a notice of job announcement for competitive positions that includes the position's "[q]ualification requirements, including knowledges [sic], skills, and abilities." 5 C.F.R. § 330.707(b)(5).

Jackson proffered evidence that in March 2001, when he applied for a GS-14 social science research analyst position, the evaluation board gave him a score of 98 out of 100, but the BOP Office of Research and Evaluation ("ORE") never filled that position. At the time, the ORE had no African-Americans in GS-13, GS-14, or GS-15 positions. Six months later ORE announced another GS-14 social science research analyst

position. This job announcement asked each applicant to address in his or her application six categories of Knowledge, Skills, and Abilities ("KSAs")[1] "in a . . . manner which will enable [the BOP] to make a reasonable determination about qualifications." Job Announcement at 1-2. The announcement made no reference to experience with the Key Indicators Strategic System ("Key Indicators")[2] as a requirement. The job description included a more detailed description of the "KNOWLEDGE AND SKILLS REQUIRED BY THE POSITION,"[3] but it also made no reference to Key Indicators

---

[1] The generic KSAs listed in the job announcement were the applicant's: (1) "[a]bility to manage resources"; (2) "[a]bility to communicate [] orally"; (3) "[a]bility to communicate in writing"; (4) "[a]bility to apply social science research methods"; (5) "[k]nowledge of statistical methods"; and (6) "[a]bility to assign responsibility and delegate authority." Job Announcement at 2.

[2] According to one of Jackson's evaluators, Key Indicators is an "elaborate, comprehensive, and technically detailed" data warehousing system. It includes information about all aspects of BOP's operations and provides data to managers in aggregate form as well as statistical and graphic analyses. *See* Gerald Gaes Dep. at 28-29 (June 11, 2004).

[3] The posted job description listed on page 2 the following "KNOWLEDGE AND SKILLS":
>—In depth knowledge of correctional programs and BOP operations and a knowledge of Department and Bureau policies and regulations.
>—Knowledge of theories in sociology, social psychology, corrections, criminal justice, and criminology.
>—Knowledge of research designs . . . .
>—Knowledge of an array of research methodologies for the observation and measurement of behavior and attitudes . . . .

experience. Jackson applied for the position, as did six other individuals, including Jennifer Batchelder, who is caucasian. At the time of her application, Batchelder, like Jackson, was a GS-13 social science research analyst, who had received outstanding performance evaluations from her supervisor, as Jackson had from his, but her principal work involved programming and collecting and processing data for use by others to carry out research. According to Thomas Kane, the BOP Assistant Director, Batchelder's work "focus[ed] more on statistical analysis and computer programming [while] Jackson [focused] more on program management and facilitation." Thomas Kane Dep. at 47 (June 14, 2004). The evaluation board gave Jackson a score of 43 out of 81, and Batchelder a score of 73. Kane, upon being presented only with the recommendation to promote Batchelder, selected her for the GS-14 position.

In response to Jackson's Title VII lawsuit, the two persons in the BOP who had evaluated the applications claimed in sworn statements that they had relied on Batchelder's work on Key Indicators in awarding her significantly higher KSA scores than the other applicants. Batchelder's application referred to articles

> —Knowledge of univariate or multivariate mathematical statistical theory and techniques appropriate for particular research designs and methodologies. . . .
> —Knowledge of statistical computer programs . . . .
> —Knowledge of IBM CMS Timesharing System, TSO, and OS Batch System.
> —Knowledge of mainframe and micro computer software . . . .
> —Skill in teaching and supervising research assistants and technicians in the knowledge and techniques necessary for social science research.
> —Skill in writing research reports for BOP managers or for distribution in the social science community.

that she had written for staff and users of Key Indicators but, unlike Jackson, Batchelder did not identify any papers that she had published, although she had written the introduction for a publication. By contrast, the evaluators justified Jackson's lower KSA scores by emphasizing the narrow nature of his work projects and technical problems with his statistical research in the papers he authored, including his masters thesis, which had been published. No mention was made of Jackson's experience with Key Indicators.

In moving for summary judgment, the Department claimed that Key Indicators experience was the critical consideration in the BOP's selection of Batchelder: "*At the time of the selection consideration*, *the overriding objective* for the [ORE] was to hire someone who could maintain . . . the Key Indicators Strategic System." Def's Mem. Supp. Summ. J. at 17–18 (emphasis added). The Department argued that the evaluators had legitimate, nondiscriminatory "concerns about [Jackson's] abilities" and properly weighed "Batchelder's expertise with Key Indicators" in awarding her higher scores. *Id.* at 18. On appeal, the Department reasserts that "[*a*]*t the time of the selection consideration*, *the overriding objective* for the [ORE] was to hire someone who could maintain [ORE's] essential and most important function — i.e., the Key Indicators Strategic System." Appellee's Br. at 21 (emphasis added). In support, the Department points to the deposition of William Saylor, who was one of the evaluators, stating that his "concern was to make certain" to hire "someone who had the skill set that would be needed to keep th[e] key indicators application functional." William Saylor Dep. at 147 (June 23, 2004).

## II.

Common sense would suggest that if Key Indicators experience was the "overriding objective" underlying the

selection of the GS-14 research analyst position, then the BOP would have mentioned that qualification in announcing and describing the job to ensure that it would receive applications from candidates with the desired experience and thus be in a position to select the candidate most qualified to maintain Key Indicators. Jackson, however, does not contend that the general nature of the job description alone creates an inference of discrimination sufficient to overcome summary judgment. Rather, Jackson contends that the inconsistency between the descriptions in the job announcement and description, on the one hand, and the evaluators' post-hoc reasons for the selection, on the other, raises an inference sufficient to preclude summary judgment. It is the specific centrality of Key Indicators experience — tardily so claimed by the Department — that contradicts the general job description and the evaluators' explanations of Jackson's low scores, neither of which mentions Key Indicators experience. Given the emphasis the Department placed on Key Indicators experience after the fact, and according Jackson as the nonmoving party all reasonable inferences, as the court is required to do, *see Anderson*, 477 U.S. at 255; *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422-23 (D.C. Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150 (2000), "a reasonable juror *could* conclude that [the BOP] would have included this qualification in the job listing had it honestly believed that it was of primary importance for the new position." *Courtney v. Biosound, Inc.*, 42 F.3d 414, 421 (7th Cir. 1994) (emphasis added) (citing *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1225 (2d Cir. 1994)).

Although a decision to promote, like a hiring decision, may involve a "dynamic" process, *Nichols v. Lewis Grocer*, 138 F.3d 563, 568 (5th Cir. 1998), dynamism cannot serve as an excuse for failing to adhere to the underlying purposes of the federal civil service system — to ensure equal opportunity and fair and open competition — by allowing the process to "drift" in its

employment objective without raising an inference, given Jackson's evidence, that such inconsistency could mask unlawful discrimination. Put otherwise, Jackson's contention is that he presented evidence, including the absence of African-Americans from high-level positions at the BOP and the BOP's failure several months earlier to fill another GS-14 research analyst position for which he had received a score of 98 out of 100, from which a reasonable inference of unlawful discrimination may be drawn. The Department does not challenge the district court's finding that Jackson had established a prima facie case of discrimination. In contending that he also has shown that the Department's explanation was pretextual, Jackson is not relying merely on the fact that the BOP based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description, *see* Op. at 10, but rather on the undisputed evidence that Key Indicators experience is not mentioned in the job announcement, the job description, or the evaluators' explanations of Jackson's low KSA scores, all of which conversely reflect a primary focus on research.[4]

_____

[4] The job announcement stated that the responsibilities of the position include supervising research analysts and "conducting research on crime and corrections." Job Announcement at 1. Further, "the research the employee conducts contributes to" several fields including, "corrections, criminal justice, criminology, and sociology" and the "[r]esearch will be utilized by the Executive Staff of the [BOP] to study the effectiveness of [BOP] programs and polices and to prescribe prescriptions for improvement." *Id.* The job description similarly focuses on research: The incumbent's primary responsibilities are supervising Ph.D. level research analysts and designing and conducting research that assists the BOP in improving and developing policies and programs and contributes to several fields of knowledge. The job description states that the "MAJOR DUTIES AND RESPONSIBILITIES" involve "formulat[ing] and direct[ing] research that answers questions of interest to the [BOP]

The court treats this case as involving the question of who as between Jackson and Jennifer Batchelder was more qualified for the GS-14 position. *See id.* at 2, 6-7. It states the evidence in the light most favorable to the Department, accepting the Department's tardy explanation that Key Indicators experience was the "overriding objective" as an established, undisputed fact. *See id.* at 2-3. Upon acknowledging that a Title VII plaintiff may prevail by showing that an employer's qualification-based explanation "is incorrect or fabricated," *id.* at 7 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc)), the court dismisses Jackson's evidence as showing only that the evaluators could have given him higher KSA scores. *See id.* By treating this case as simply a matter of the BOP choosing the more qualified applicant, *see id.* at 6-7, however, the court ignores the material issue of disputed fact raised by Jackson's evidence that goes directly to the question of what type of applicant BOP actually sought in announcing the GS-14 research analyst position — a research analyst with the announced skills and experience or a computer programmer with Key Indicators experience?

The court's efforts to bolster its holding do not withstand examination. First, the court relies on the district court's conclusion that Key Indicators skills are a component of the skills listed for the GS-14 position. *See id.* at 8. However, this is not the same as the Department's proffered nondiscriminatory explanation that Key Indicators skill was the "overriding" requirement for the research analyst position. Some of the categories of "KNOWLEDGE AND SKILLS" listed in the job description refer to statistical and computing skills, including familiarity with "mainframe and micro computer software," Position Description at 2, but none mentions Key Indicators

---

administration" and describes the activities involved in the research tasks. Job Description at 1.

experience. Instead, the job description focuses on research skills and responsibilities. Thus, the job description does not support the Department's contention that *specific* expertise in Key Indicators was the decisive requirement for filling the GS-14 research analyst position.

Second, the court observes that "job descriptions are often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors." Op. at 8-9. True but irrelevant. The court ignores two undisputed facts. One, the BOP's job announcement and description set forth the qualifications and nature of the position. The job announcement outlines the "DUTIES" of the position, lists three categories of required "SPECIALIZED EXPERIENCE," and lists six "KSAs." Job Announcement at 1, 2. The job description sets forth the incumbent's three major responsibilities, the particular emphasis of the studies that the GS-14 researcher will conduct, the manner in which the research will be used by BOP's Executive Staff and by top management in the Federal Sentencing Commission and other agencies, and other objectives of the incumbent's research. The job description also includes two paragraphs explaining the "MAJOR DUTIES AND RESPONSIBILITIES" and includes a page-long listing of "KNOWLEDGE AND SKILLS REQUIRED BY THE POSITION," *see supra* note 3, and two-and-a-half additional pages of description of various aspects of the position's responsibilities, including research guidelines, the complexity of the research projects, and the "SCOPE AND EFFECT OF THE WORK." Job Description at 1, 2, 4. Nowhere in the job announcement or the description is Key Indicators experience mentioned. Two, the evaluators' explanations for giving Jackson low scores make no mention of his Key Indicators experience or lack thereof and thus undercut the tardily claimed primacy of Key Indicators experience. The evaluators' preoccupation with Jackson's research abilities — with

inconsistent reliance on Key Indicators experience in grading Jackson's and Batchelder's applications — undermines the Department's claim that expertise in Key Indicators was the "overriding consideration" for the selection.

Reasonable employers may not "ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by [a] written job description[]," Op. at 9 (quoting *Aka*, 156 F.3d at 1297 n.15), but a reasonable jury could conclude that neither would a reasonable employer neglect to mention the single most important requirement in the job announcement, job description, and explanation of an applicant's low scores. If Key Indicators experience was as crucial to the GS-14 research analyst position as the Department now claims, then a juror could reasonably expect it to be mentioned by the job announcement and description, much less in the evaluators' explanations of Jackson's low scores. How else could the BOP ensure, consistent with the purposes of the federal civil service system, that it would receive applications from the most qualified persons and be in a position to select the most qualified individual to carry on the Key Indicators work? Here, the job announcement and description did not refer to Key Indicators experience and there is a disconnect between Saylor's assertions of Key Indicators' primacy and the evaluators' explanations of Jackson's scores. This evidence raises the question of Saylor's credibility as to whether Key Indicators experience was the "overriding" requirement of the GS-14 social science research analyst position at the time of the selection. A credibility determination is the domain of the trier of fact, *see Anderson*, 477 U.S. at 255, and raises a genuine issue of material fact as to the Department's asserted nondiscriminatory reason for selecting Batchelder, making summary judgment inappropriate. In other words, from the absence of any mention of Key Indicators experience in the announcement and description of the GS-14 position and in the explanations of

Jackson's low scores, a reasonable juror could conclude that Saylor's assertion that Key Indicators experience was the central criterion underlying the ORE's desire to fill the GS-14 research analyst position was fabricated.

The conclusion that Jackson has raised a genuine issue of material fact in no way requires the court to "second-guess an employer's initial choice of appropriate qualifications" or contravene the principle that "courts 'defer to the [employer's] decision of what nondiscriminatory qualities it will seek' in filling a position." Op. at 9 (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)). Neither does it mean that employers would be required to "publish [] contemporaneous statement[s] of reasons every time they make a hiring or firing decision." *Id.* at 11. It means only that, in accordance with the requirements of the federal civil service, an employer must provide notice to prospective job applicants of the relevant skills and requirements on which it intends to rely in making a decision. Jackson is not challenging the qualifications that the ORE found necessary for the GS-14 research analyst position, but instead he is challenging whether the qualification now claimed to be the "overriding consideration" actually did play such a central role in the selection process or whether BOP manufactured this justification after selecting Batchelder. That a reasonable trier of fact could accept the Department's explanation by crediting Saylor is not, as the court appears to assume, *see id.* at 9-10, the standard for summary judgment. *See Anderson*, 477 U.S. at 252.

None of the cases cited by the court, or the district court, reach a contrary conclusion and all are factually distinguishable. For example, in *Davis v. Ashcroft*, 355 F. Supp. 2d 330 (D.D.C. 2005), the job announcement did not "list the requisite qualifications for the position," *id*. at 340 — unlike the BOP's job announcement and description, which listed a series of

qualifications and required skills but failed to mention Key Indicators experience — and the plaintiff challenged "the soundness" of using the disputed factor as a qualification for a position, not whether the factor had in fact been used, *see id.* at 342-43. Jackson is not disputing the utility of Key Indicators experience as a qualification but rather the Department's claim that Key Indicators skill was in fact the critical qualification for the research analyst position. Neither is Jackson contesting the Department's evaluation of specific employment criteria; instead he relies on an inconsistency between the job description and the "overriding objective" that the Department claims in litigation was the decisive factor in the selection process but was omitted from the job description and his evaluation.

Because the *timing* of the Department's emphasis on the centrality of Key Indicators experience for the GS-14 research analyst position defines this case, and not whether the Department "changed the importance of the criteria [it] used in the selection process," *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1255 n.2 (11th Cir. 2000), this case also differs from *Lamb v. Boeing Co.*, 213 Fed. App'x 175 (4th Cir. 2007) (unpublished opinion), and *Browning v. Department of the Army*, 436 F.3d 692 (6th Cir. 2006). *See* Op. at 9-10. In *Lamb*, the plaintiff offered "no evidence" of pretext aside from the absence of the disputed criteria from the job description, *Lamb*, 213 Fed. App'x at 179-80, while Jackson points to more, *see supra* p. 6. In *Browning*, the plaintiff was on notice that the employer considered the disputed factor to be an important qualification and instead challenged the weight given to an employment criterion identified in "both the job description and the matrix" designed to evaluate applicants. *Browning*, 436 F.3d at 696-97. Jackson, however, has proffered evidence of a disconnect between the Department's post-hoc justification for the selection and "[w]hat [the Department] intended when it advertised this position," *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219,

1227 (2d Cir. 1994), thus, distinguishing this case from cases such as *Holcomb v. Powell*, 433 F.3d 889, 897-99 (D.C. Cir. 2006), in which the court deferred to the employer's weighing of the candidates' qualifications and found inadequate evidence to support the plaintiff's contention that the employer had misstated her qualifications, and *Stewart v. Ashcroft*, 352 F.3d 422, 429-30 (D.C. Cir. 2003), in which the court deferred to the employer's comparison of the candidates' qualifications and the employer's determination of the skills necessary for the position.

As the court observed in *Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003), a "plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight" in establishing a material factual dispute regarding unlawful discrimination. *Id.* at 1089 (quoting *Aka*, 156 F.3d at 1290). While courts must "be sensitive to the necessary and appropriate realities of hiring processes," Op. at 9, courts cannot ignore, in determining whether summary judgment is appropriate, evidence that raises a material question of fact and be so deferential as to allow employers to mask unlawful discrimination with post-hoc justifications for employment decisions. Because Jackson has raised a genuine issue of material disputed fact as to the centrality of Key Indicators experience in filling the GS-14 research analyst position, summary judgment for the Department was inappropriate and I would remand the case to the district court for further proceedings. Accordingly, I respectfully dissent.