Opinion for the Court filed by Circuit Judge KAVANAUGH, in which Circuit Judge HENDERSON joins.
Dissenting opinion filed by Circuit Judge ROGERS.
KAVANAUGH, Circuit Judge:
Kevin Jackson worked as a GS-13 employee in the Bureau of Prisons. Jackson and six other individuals applied for an open GS-14 research analyst position. The Bureau selected Jennifer Batchelder, a Caucasian woman. Jackson, who is African-American, sued and alleged racial discrimination in violation of Title VII. In its defense, the Bureau said it selected Bat-chelder because she was more qualified than Jackson. The District Court granted summary judgment to the Bureau, concluding that a reasonable jury could not find the Bureau’s explanation a pretext for racial discrimination. We agree with the District Court and therefore affirm.
I
Kevin Jackson, an African-American man, and Jennifer Batchelder, a Caucasian woman, worked as GS-13 employees in the Bureau of Prisons. Both applied for a GS-14 research analyst job at the Bureau, as did five other individuals. A two-person initial evaluation board scored all applicants based on six general qualifications — also called “KSAs,” short for “knowledge, skills, and abilities” — and other personal characteristics needed in the job to be filled. J.A. 276.[1] The board members sought to hire an applicant who had experience with the Bureau’s main data management tool, known as the Key Indicators Strategic System, although the job description documents did not expressly refer to Key Indicators experience as a specific qualification (the documents listed more general qualifications). The Key Indicators system includes information about all aspects of the Bureau’s operations, such *706 as health care, sentencing issues, and inmate conduct and misconduct. In addition to aggregating the data, the system uses statistical and graphical tools to show how the relevant aspects of the Bureau’s operations change over time.
Batchelder received by far the highest numerical score on the KSAs — 52 out of 60 possible points. By contrast, Kevin Jackson received 22 points out of 60, which placed him third among the seven applicants. Batchelder also had significantly more experience than Jackson with the Key Indicators system. Both employees received 15 points for past performance and six points for awards — yielding total scores of 73 points for Batchelder and 43 points for Jackson. Because Batchelder’s score was much higher than all the other candidates, the board forwarded only her name to the final decision-maker, Thomas Kane. Kane in turn selected Batchelder for the position.
Jackson then sued, alleging racial discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. In the district court, the Bureau explained that it hired Batchelder because she was better qualified, particularly in light of her extensive experience with the Key Indicators system. The District Court granted summary judgment to the Bureau, stating that Jackson failed to show he was significantly more qualified and that it was “therefore not proper to ‘second-guess [the] employer’s personnel decision.’ ” Jackson v. Gonzales, No. Civ.A. 03-1596, 2005 WL 3371041, at *11, *13 (D.D.C. Dec. 12, 2005) (quoting Fischbach v. D.C. Dep’t of Corr., 86 F.3d 1180, 1183 (D.C.Cir.1996)) (alteration in original). The District Court also concluded that the Bureau’s reliance on a factor not expressly listed in the job description (Key Indicators experience) did not undermine the Bureau’s explanation for its hiring decision because such experience was clearly encompassed by the qualifications listed in the job description. See id. at *10 (“[I]t is clear that Key Indicator System skills are a component of the overall skills necessary for the GS-14 position.”); id. (“[Although not specifically mentioned in the vacancy announcement or job description, the general terms used in these documents clearly indicate a desire on the part of the defendant to hire someone with skills acquired from working with the Key Indicator System.”).
On appeal, Jackson argues that there is a genuine issue of material fact regarding whether the Bureau’s real reason for not selecting him was racial discrimination. Our review is de novo. Haynes v. Williams, 392 F.3d 478, 481 (D.C.Cir.2004).
II
Title VII of the Civil Rights Act, as amended, provides that all “personnel actions affecting employees or applicants for employment” in Executive agencies “shall be made free from any discrimination based on race.” 42 U.S.C. § 2000e-16(a). “Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), to analyze the claim.” Holcomb v. Powell, 433 F.3d 889, 895 (D.C.Cir.2006) (citation omitted in part). Although “intermediate evi-dentiary burdens shift back and forth under this framework, ‘[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.’ ” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) *707 (quoting Tex. Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (alteration in original).
The McDonnell Douglas framework first requires the plaintiff to establish a prima facie case of discrimination by-showing that: “(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone ... filled the position or the position remained vacant and the employer continued to seek applicants.” Lathram v. Snow, 336 F.3d 1085, 1088 (D.C.Cir.2003) (quotation marks omitted and alteration in original). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant employer to produce “ ‘evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.’ ” Reeves, 530 U.S. at 142, 120 S.Ct. 2097 (quoting Burdine, 450 U.S. at 254, 101 S.Ct. 1089). “If the defendant satisfies that burden, the McDonnell Douglas framework — with its presumptions and burdens — disappears, and the sole remaining issue is discrimination vel non.” Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D.C.Cir. 2002) (quotation marks and alterations omitted). At that point, the plaintiff can survive summary judgment only by showing “that a reasonable jury could conclude that [he] was terminated for a discriminatory reason.” Id. To make such a showing, the plaintiff must prove that a reasonable jury could infer that the employer’s given explanation was pretextual and that this pretext shielded discriminatory motives. See Murray v. Gilmore, 406 F.3d 708, 713 (D.C.Cir.2005).
The Bureau here said it selected Jennifer Batchelder because she was more qualified and had superior Key Indicators experience. When an employer' says it made a hiring decision based on the relative qualifications of the candidates, “we must assume that a reasonable juror who might disagree with the employer’s decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone.” Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C.Cir.1998) (en banc). On the other hand, if a factfinder can conclude that a “reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate — something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.” Id.; see also Holcomb, 433 F.3d at 897; Stewart v. Ashcroft, 352 F.3d 422, 429-30 (D.C.Cir.2003). Applying Aka, we have explained that “[i]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination.” Holcomb, 433 F.3d at 897. To conclude otherwise would be to render the judiciary a “super-personnel department that reexamines an entity’s business decisions” — a role we have repeatedly disclaimed. See id. (quotation marks omitted).
Here, as the KSA scores indicate, the evidence presented by Jackson does not suggest that he was “significantly better qualified” than Jennifer Batchelder. Aka, 156 F.3d at 1294. On the contrary, it plainly suggests that Batchelder was better qualified. To be sure, we have also stated that a plaintiff may present evidence to show that the employer’s qualifications-based explanation “is incorrect or fabricated.” Id. at 1295; see also Holcomb, 433 F.3d at 898. Jackson thus alleges certain discrepancies between the candidates’ qualifications and the evaluation *708 board’s ratings. But it is undisputed that Batchelder had been an outstanding employee at the Bureau; that her experience with the Key Indicators system was substantially superior to Jackson’s; that the Key Indicators system was important to the Bureau’s operations; and that Batchel-der received by far the highest KSA scores of any candidate who applied for the job.
Jackson’s evidence at most shows that the evaluators could have given him somewhat higher scores and Batchelder somewhat lower scores than they did. That is not enough, however, to demonstrate that the Bureau’s reliance on comparative qualifications was a pretext for discrimination: “This Court will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision.” Stewart, 352 F.3d at 430. Like the plaintiff in Stewart, Jackson “was simply not discernibly better” than the candidate promoted. Id. at 429.
Jackson also contends that a reasonable jury could disbelieve the Bureau’s reliance on Batchelder’s superior Key Indicators experience as the overriding factor because the job description documents did not expressly refer to Key Indicators knowledge or experience. Although this argument may present a closer question given the somewhat unusual facts of this case, we agree with the District Court that the evidence presented by Jackson does not create an inference of discrimination sufficient to overcome summary judgment.[2]
To begin with, as the District Court correctly recognized, Key Indicators experience was clearly encompassed by the qualifications listed in the job description. See Jackson, 2005 WL 3371041, at *10 (noting that Bureau sought applicants with ability to use statistics to describe and predict trends in Bureau data). Indeed, Key Indicators experience was directly relevant to at least two of the KSAs set forth in the generic vacancy announcement: ability to manage resources, and ability to assign responsibility and delegate authority. In addition, the more detailed list of qualifications set out in the position description included “[kjnowledge of statistical computer programs” and “computer software,” and thus plainly encompassed Key Indicators experience. J.A. 280.
As we have explained before, moreover, job descriptions are often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors — such as their strategic priorities and goals at the time, the strengths and weaknesses of the applicant pool, and the overall skills of and gaps in their existing workforce, among many other factors. We have said that courts must not second-guess an employer’s initial choice of appropriate qualifications; rather the courts “defer to the [employer’s] decision of what nondiscriminatory qualities it will seek” in filling a position. Stewart, *709 352 F.3d at 429; see also Browning v. Dep’t of the Army, 436 F.3d 692, 698 (6th Cir.2006) (“Questioning [the employer’s] hiring criteria is not within the province of this court_”). Particularly given the dynamic nature of the hiring process, moreover, we have also stated that we will not second-guess how an employer weighs particular factors in the hiring decision. See Barnette v. Chertoff, 453 F.3d 513, 517 (D.C.Cir.2006) (“[C]our.ts must defer to the employer’s decision as to which qualities required by the job ... it weighs more heavily.”). Indeed, we have even said that an employer may select “a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview” — although we are of course cautious in accepting such purely subjective explanations when the plaintiff otherwise is “significantly better qualified.” Aka, 156 F.3d at 1294 & n. 10.
In Aka, we explained that courts must be sensitive to the necessary and appropriate realities of hiring processes. Reasonable employers, we said, “do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job.” Id. at 1297 n. 15. Other courts of appeals have reached the same conclusion. See Lamb v. Boeing Co., 213 Fed.Appx. 175, 180 (4th Cir.2007) (“Title VII does not impose the impracticable obligation' of anticipating and recording before the fact a company’s valuation of every credential with which it might be presented, and we cannot sanction the inference that the credentials upon which the hiring managers said they relied were pretexts merely because they were not listed in advance.”); Browning, 436 F.3d at 696-97 (“employers are not rigidly bound by the language in a job description”; employer’s “decision to weigh administrative/managerial experience more heavily than the job description suggested [was] simply not sufficient to demonstrate” falsity of employer’s qualifi-eations-based explanation); Lee v. GTE Fla., Inc., 226 F.3d 1249, 1255 n. 2 (11th Cir.2000) (evidence that employer “changed the importance of the criteria he used in the selection process” did not tend to show that employer’s asserted nondiscriminatory explanation was false); Nichols v. Lewis Grocer, 138 F.3d 563, 568 (5th Cir.1998) (hiring decisions are “dynamic,” and “relative importance placed on various selection criteria cannot be expected to remain fixed and unyielding” throughout the process).
All of these various formulations and precedents establish a clear principle for purposes of this case: The fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment. Indeed, we are aware of no previous case from this or any other circuit suggesting that an employee gets past summary judgment simply by showing that a factor in the hiring decision was not expressly listed in the job description when the factor was encompassed by the job description. Therefore, Jackson cannot overcome summary judgment on this basis.
Finally, we do not agree with Jackson that the timing of the Bureau’s explanation of its hiring decision somehow casts doubt on the credibility of that explanation and therefore is evidence of pretext. Before Jackson commenced this employment discrimination suit, the Bureau simply had no occasion to explain its decision to hire Bat-chelder; rather, the first time the Bureau had to explain that decision was in defend *710 ing this case. The Bureau’s explanation therefore cannot be considered “post-hoc” or “tardily” asserted. Cf. Dissenting Op. at 712-13, 716-17. To suggest otherwise is essentially to direct employers to publish a contemporaneous statement of reasons every time they make a hiring or firing decision — a requirement that Title VII has never been understood to impose.
Ill
We affirm the District Court’s grant of summary judgment to the Bureau of Prisons.

So ordered.

. The generic KSAs included the applicant’s: (1) ability to manage resources; (2) ability to communicate orally; (3) ability to communicate in writing; (4) ability to apply social science research methods; (5) knowledge of statistical methods; and (6) ability to assign responsibility and delegate authority. J.A. 276. The Bureau also posted a more detailed job description, which listed the following skills and knowledge as job requirements: in-depth knowledge of correctional programs and Bureau operations and a knowledge of Bureau policies and regulations; knowledge of theories in sociology, social psychology, corrections, criminal justice, and criminology; knowledge of research designs; knowledge of an array of research methodologies for the observation and measurement of behavior and attitudes; knowledge of univariate or multivariate mathematical statistical theory and techniques appropriate for particular research designs and methodologies; knowledge of statistical computer programs; knowledge of IBM CMS Timesharing System, TSO, and OS Batch System; knowledge of mainframe and micro computer software; skill in teaching and supervising research assistants and technicians in the knowledge and techniques necessary for social science research; and skill in writing research reports for Bureau managers or for distribution in the social science community. J.A. 280.

. The dissenting opinion appears to suggest that Jackson's case survives summary judgment in part because the Bureau lacked high-level African-American employees. See Dissenting Op. at 711, 713. But Jackson never made such an argument either before the District Court in opposing summary judgment or before this Court on appeal. On the contrary, Jackson has consistently maintained that "[t]he material factual dispute here is rooted in the two employees’ respective performance histories and qualifications.” Pl.'s Opp'n to Def.’s Mot. for Summ. J. at 14 (emphasis added). Cf. Aka, 156 F.3d at 1295 n. 11 (“For instance, if a female plaintiff claims sex discrimination, evidence that the defendant employs women at rates far below their numbers in the applicant pool and the general population may well help her case.”).