

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2009

# Gloria J. Walters v. Gale Norton

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-2746

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Gloria J. Walters v. Gale Norton" (2009). *2009 Decisions.* Paper 1360.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1360

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-2746

GLORIA J. WALTERS,
                                        Appellant

v.

GALE NORTON, Secretary of the Interior, United States of America

APPEAL FROM THE DISTRICT COURT OF THE VIRGIN ISLANDS,
DIVISION OF ST. THOMAS/ST. JOHN
(D.C. Civil No. 04-cv-00009)
District Judge:  Honorable Juan R. Sanchez

Argued:  April 21, 2009

Before: BARRY, HARDIMAN, and COWEN, <u>Circuit Judges</u>

(Opinion Filed: May 15, 2009)

Karin A. Bentz, Esq. (Argued)
Law Offices of Karin A. Bentz
18 Dronningens Gade
Suite 8
St. Thomas, VI 00802

<u>Counsel for Appellant</u>

Timothy J. Abraham, Esq. (Argued)
Office of the United States Attorney
United States Courthouse
5500 Veterans Building, Suite 260
Charlotte Amalie, St. Thomas
USVI, 00802-6924

Counsel for Appellee

_____

OPINION

_____

BARRY, Circuit Judge

Gloria Walters is a General Service (GS) 13 auditor with the Department of the Interior, Office of the Inspector General (OIG), in St. Thomas, Virgin Islands. Walters and Hannibal "Mike" Ware, likewise a GS-13 auditor, applied for an open GS-14 senior auditor position in March 2002. The OIG selected Ware, a black male born in the Virgin Islands who was thirty-three years of age at the time. Walters, a black female who was born in the Caribbean nation of St. Kitts and Nevis (and who has since become a naturalized United States citizen) was fifty-seven years old when Ware was selected. She subsequently filed this action against the Secretary of the Interior, alleging that the OIG discriminated against her on the basis of age, sex, and national origin. The OIG countered that it selected Ware because he had stronger interpersonal skills and lacked Walters's history of intra-office personal disputes. It further stated that Ware possessed slightly better technical auditing and writing skills. The District Court granted summary

judgment in favor of the OIG, concluding that a reasonable jury could not find the OIG's explanation a pretext for illegal discrimination. We will affirm.

## I. Facts & Background

### A. Employment History

Walters began working in the OIG's Caribbean Field Office in 1986 at the age of forty, as a GS-4 student intern. Ware had a similar beginning, albeit four years later, when he started in 1990 as a GS-5 trainee. At all times after January 1991, Walters and Ware worked under the direction of Arnold van Beverhoudt, Jr., who was a GS-15 field office supervisor – the highest ranking employee in the Caribbean office.

Walters steadily climbed the auditing ladder, receiving yearly promotions until she reached GS-12 status in 1991. Ware followed the same path, attaining GS-12 status in 1994. Both were promoted to the GS-12 level by van Beverhoudt. Typically, GS-12 auditors work on audits that are directed by more senior office personnel, although in some instances GS-12 auditors are permitted to be "auditors-in-charge" (Appendix at 567); in those instances, they plan and manage the audits. Walters worked at the GS-12 level for five years and four months – from February 1991 until she was promoted, again by van Beverhoudt, to GS-13 in June 1996. Ware spent a bit longer at the GS-12 level – just a few days less than six years – until he was promoted, on July 30, 2000, to GS-13. The central role of GS-13 auditors is that of "auditor-in-charge," as they are responsible for overseeing individual OIG audits.

Walters and Ware were effective auditors at both the GS-12 and GS-13 levels. Walters's performance reviews – conducted by van Beverhoudt, and Stacey Chados, a GS-14 auditor until she left the office in June 2001 – described the "good quality" of her work, and noted that she "demonstrated technical competence in areas of assigned responsibility." (*Id*. at 91, 97.) Additionally, as auditor-in-charge, she "assigned [work] fairly" and "effectively supervised" the staff. (*Id.* at 91, 95.)

Ware's work likewise received positive reviews. Van Beverhoudt and Chados reported that he "effectively gathered, [] documented" and "analyzed" data (*id*. at 222), and that his written work was "clear, concise and well organized," requiring no more than "minor revision" by his supervisors. (*Id*. at 145.) Ware's reviews plainly contained praise that Walters's did not; Chados, for example, reported that Ware "continues to excel in the area of oral communication," and further stressed that he had "excellent communication skills." (*Id*. at 143.) Chados also stated that "Ware continues to conduct himself in a *highly professional* manner." (*Id.* at 142.) (emphasis added).

Such comments about professionalism were absent from Walters's reviews that were conducted during the same time period. Instead, in her 1999-2000 review, Chados commented that Walters "at times has shown a lack of respect for management of the Caribbean Regional Office." (*Id*. at 95.) Chados described editing one of Walters's audit reports and noted that Walters was "not receptive to the suggested changes made by the Senior Auditor," and "refused to proofread the draft prior to issuing the report." (*Id*.)

Although Walters denies that she refused to proofread the report, she admits that Chados (her supervisor) had to "completely re-writ[e]" it. (*Id.* at 97.) As auditor-in-charge of a different audit, Walters expressed frustration that a junior auditor did not have her own transportation, and falsely instructed her that an automobile was part of the job requirement.

Walters's supervisors were concerned that because she was an experienced auditor, her "actions [were] impressionable to the other staff members." (*Id.* at 95.)[1] She had little use for the office's administrative procedures, which required "[a]ll employees working at field sites [to] inform the Administrative Assistant on a daily basis of the location where they will be working and a phone number where they can be reached," and to give "an estimate of the length of time they will be" out of the office. (*Id.* at 414-15.) Instead of estimating her return, Walters routinely put a question mark on the office log, which caused friction with the administrative assistant, Sheri Meyers, who was responsible for overseeing the log. On one occasion, in late April 2000, that friction boiled over. Meyers instructed Walters to properly fill out the office log and Walters refused. Walters later called the office to inform Meyers that she would not be back, and derisively referred to her as the "boss." (*Id.* at 300.) She further instructed Meyers that

---

[1] Van Beverhoudt, in an email to his supervisor in Washington, D.C. – Roger LaRouche, Assistant Inspector General for Audits – dated July 12, 2000, described Walters's behavior in direct language. He wrote that Walters "appears to be the 'ring leader' [of a small clique in the office] who stirs up [trouble] and then sits back to watch the fireworks." (*Id.* at 403.)

she outranked her and could handle her own administrative affairs.

The following morning, Walters and Meyers engaged in a heated argument. The argument was long enough, and loud enough, that Chados heard it from down the hall and went to break it up. It also had substantial repercussions. Upon his return to the office, van Beverhoudt convened an all-office meeting on May 18, 2000 to discuss "employee conduct issues." (*Id.* at 433, 437-40.) At that meeting he described the "unruly" encounter between Walters and Meyers as "unacceptable," and stated that the tension between the two affected the entire office. (*Id.* at 437.) He further noted that experienced employees "should be setting an example for the younger staff," and stated clearly: "If Sheri tells you that you need to indicate on the sign-out [log] the estimated time when you'll be back . . . Do It!" (*Id.* at 438-39). A description of the argument was also featured prominently in van Beverhoudt's July 12, 2000 email to his supervisor, LaRouche, who read the email and scheduled "a trip to the Virgin Islands to see what the hell was going on." (*Id.* at 485.) When LaRouche arrived, he too convened an all-office meeting to send the message that the Caribbean office is "small" and "we don't need these headaches from such a small office that has a future that could be in jeopardy. It'd be easier just to close the office, frankly." (*Id.* at 485).

Thereafter, the office disputes continued to simmer below the surface, but "things did improve." (*Id.* at 488.) The record indicates that at all times before and after the incident, Ware maintained a good working relationship with all members of the staff.

**B. GS-14 Vacancy**

On March 19, 2002, the OIG announced a GS-14 senior auditor vacancy, a role that includes "planning, directing, and guiding audit teams . . . or serving as a full-time team leader on assignments of extreme complexity," and generally managing the work of *all* audit teams. (*Id.* at 176.) Applicants were required to have a "degree in accounting," and at least "one year of specialized experience" at the GS-13 level. (*Id.* at 177.)

Ware and Walters were the only two qualified candidates to apply, and they were to be evaluated on their "experience, education, training, self-development, and performance appraisals as they related" to the "knowledge skills and abilities" (KSAs) required for the position. (*Id.* at 177.) The GS-14 position was of particular importance because van Beverhoudt planned to retire in the near future (as he did, in April 2006). Given the small size of the Caribbean Field Office, van Beverhoudt's GS-15 position would be phased out, and the person selected as GS-14 would be the next head of the office.

Van Beverhoudt recommended Ware for the promotion, and, though his superiors in Washington – including LaRouche – had the ability to override his recommendation, they did not do so. He notified Walters of his decision on April 19, 2002, informing her that he had chosen Ware "[b]ecause he gets along with more people on the staff" and his work was "more complete." (*Id.* at 87; 572-73.) He further stated that "Mike [Ware] will be better for the office in the long run." (*Id.*)

## C. Procedural History

On July 15, 2002, Walters filed a timely formal discrimination complaint with the Department of the Interior Office for Equal Opportunity (OEO), alleging discrimination based on sex and age. She later amended her complaint to also allege discrimination on the basis of national origin.

In an affidavit filed in the OEO's investigation, van Beverhoudt outlined the reasons for his decision. He stated that he viewed the candidates as "almost equal" on the first KSA, but noted that Ware had a slight edge because his audit reports demonstrated better analysis. (*Id.* at 118.) Regarding the second KSA, he found Ware to be "clearly the better candidate in the areas of supervision and management." (*Id.* at 119.) On the third KSA – which focused on communication skills – Ware "was clearly superior." (*Id.* at 120.) The fourth KSA demanded "skill in writing . . . and editing," and van Beverhoudt noted that the two had similar skills, though Ware's written products were more "'polished' than those prepared by [] Walters." (*Id.* at 121.) On the fifth KSA, van Beverhoudt noted that Ware had volunteered to work as the computer network administrator, and had "earned the respect of information technology specialists" for doing so; that, van Beverhoudt reasoned, reflected well on his ability to "plan and direct special projects." (*Id.* at 122.) In sum, van Beverhoudt stated that "the two candidates were fairly evenly matched in terms of the technical elements of the job, with a slight edge to [] Ware." (*Id.*) Given the managerial nature of the GS-14 role, van Beverhoudt

placed "predominant emphasis on the interpersonal skills of the two candidates," and felt that Ware was "clearly superior" in that regard. (*Id.*)

The OEO denied Walters's discrimination complaint on January 16, 2004, finding that Walters provided no evidence to support her allegations and that "no corrective action [was] warranted." (*Id.* at 360.) Walters subsequently filed this action, alleging that van Beverhoudt's employment decision was based on gender and national origin, in violation of Title VII, and on age, in violation of the Age Discrimination in Employment Act (ADEA).

The District Court granted summary judgment in favor of the OIG, holding: that Walters had established a prima facie case of discrimination; that the OIG, in turn, articulated a legitimate nondiscriminatory reason for the adverse employment decision; and that Walters's proffered evidence failed to cast a substantial doubt on the OIG's articulated reasons.

## II.  Jurisdiction & Standard of Review

We have jurisdiction over the final order of the District Court, pursuant to 28 U.S.C. § 1291, and "[o]ur standard of review of a grant of summary judgment is plenary." *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 557-58 (3d Cir. 2008). In conducting our review, we must view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Fasold v. Justice*, 409 F.3d 178, 180 (3d Cir. 2005).

### III. Discussion

We utilize the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when assessing Title VII and ADEA discrimination claims brought under a pretext theory. *Keller v. Oriz Credit Alliance, Inc.* 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (Alito, J.); *see Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005); *cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (assuming without deciding that the *McDonnell Douglas* framework applies to ADEA actions). "Under the *McDonnell Douglas* paradigm, an employee must first establish a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold*, 409 F.3d at 184. The presumption of discrimination established by the plaintiff's prima facie case "'drops out of the picture' once the defendant meets its burden of production." *Reeves*, 530 U.S. at 143 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).

The plaintiff, then, "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To survive a motion for summary judgement, "the plaintiff generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a

factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994); *see Fasold*, 409 F.3d at 185; *Keller*, 130 F.3d at 1108. The *Fuentes* standard "places a difficult burden on the plaintiff." 32 F.3d at 765.

The District Court's conclusion that Walters established a prima facie case is not disputed before us by the OIG. The sole issue of contention, therefore, is whether Walters raised a material issue of fact as to whether the OIG's proffered non-discriminatory reasons for promoting Ware were a pretext for discrimination. *See Kautz*, 412 F.3d at 467. "Determining pretext is a fact-based inquiry. We must, therefore, look carefully" at each of the proffered reasons, as well as Walters's "claim of pretext regarding each of these reasons." *Id.* at 468.

Walters attempts to cast doubt upon van Beverhoudt's justification for promoting Ware by contending first that van Beverhoudt purposefully understated her experience (and overstated Ware's) to legitimize his emphasis on interpersonal skills; and second that because the KSAs that set forth the job requirements for a GS-14 senior auditor did not list interpersonal skills, van Beverhoudt's reliance on that factor is a *post-hoc* fabrication.

There is little question that Walters was the more experienced candidate for the position, and the OIG does not argue otherwise. When the GS-14 vacancy was announced, Walters had worked as an auditor at the OIG for sixteen years, while Ware

had only twelve years of experience. Additionally, Walters had been at the GS-13 level for five years and nine months, compared with Ware's one year and nine months. Walters notes, accurately, that the previous two GS-13 auditors to be promoted to GS-14 were both the most experienced GS-13 auditors at the time of their promotions. Yet, the GS-14 vacancy announcement stated, quite clearly, that experience was only *one* factor to be considered. Moreover, the experience factor does not weigh as heavily in Walters's favor as she suggests. Walters and Ware had been auditor-in-charge for a comparable number of audits, as Walters led approximately twelve audits and Ware led seven general audits and eight watch and jewelry quota audits.[2]

"We have applied the principles explained in *Fuentes* to require plaintiffs to present evidence contradicting the core facts put forth by the employer as the legitimate reason for its decision," *Kautz*, 412 F.3d at 467, and here Walters falls short. Her argument, essentially, is that her experience should have been the determinative factor, and that it clearly was not. That does not, however, call into question the OIG's articulated reasons for choosing Ware – namely that his technical skills and written work were "more polished," and that his interpersonal skills were far more developed. Walters admits that at least one of her reports as auditor-in-charge was "completely re-written" by

---

[2] Walters tries to portray the watch and jewelry quota audits as simpler and less difficult than audits of other government programs, but there is no evidence in the record to that effect. Even assuming that the watch and jewelry quota audits were less complex, and therefore should be afforded less weight, Ware's experience at the time of the promotion was substantial.

her supervisor, and she has presented no evidence that Ware's work product ever required such substantial revisions. She admits to disregarding the office's administrative procedures, and likewise concedes that she and Meyers engaged in a disruptive argument in late April 2000. Rather than casting doubt on whether the argument occurred, she instead asserts that it was a natural result of van Beverhoudt's "poor administrat[ive]" habit of delegating too much authority to the administrative assistant. (*Id.* at 298, 190.) The issue here is not, however, whether van Beverhoudt was an effective field office supervisor, but instead whether he promoted Ware for discriminatory reasons. Walters must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in van Beverhoudt's explanation for promoting Ware "that a reasonable factfinder could rationally find them unworthy of credence," *Fuentes*, 32 F.3d at 765, and she has not done so.

Walters further contends that van Beverhoudt's emphasis on interpersonal skills was a *post hoc* fabrication because such skills were not listed as KSA requirements. It is, however, clear from the vacancy announcement that the ability to communicate is essential to the role of a GS-14 auditor. The role includes "planning, directing, and guiding audit teams," and "participating in the development of detailed audit plans setting forth the scope, objectives, staff assignment and time/cost budget." (*Id.* at 176.) Additionally, the second KSA calls for the applicant to have an "ability to plan, supervise and manage multiple complex . . . audits," which undoubtedly requires well-honed

communication skills.  (*Id.* at 177.)  The third KSA is even more specific, requiring the

"ability to communicate and interact with management officials at all levels."  (*Id.*)

Walters relies heavily on *Jackson v. Gonzales*, 496 F.3d 703 (D.C. Cir. 2007), as

support for her argument that because the KSAs did not specifically list "interpersonal

skills" as a qualification for the GS-14 position, their consideration was evidence of

pretext.  Her reliance is curious, as *Jackson* supports precisely the opposite conclusion.  In

response to the same argument made by Walters, the *Jackson* Court stated that reasonable

employers "do not normally limit their evaluation of applicants to a mechanistic check-off

of qualifications required by the written job description[,] [and] [o]bviously they will take

additional credentials into account, if those credentials would prove useful in performing

the job."  *Id.* at 709 (quotation marks and citations omitted).  The Court further stated:

"[W]e are aware of no previous case from this or any other circuit suggesting that an

employee gets past summary judgment simply by showing that a factor in the hiring

decision was not *expressly listed* in the job description when the factor was *encompassed*

by the job description."  *Id.*; *see also Kautz*, 412 F.3d at 468 ("[a]n employer may not use

evaluating criteria which lacks any relationship at all to the performance of the employee

being evaluated because to do so would be inconsistent with and contradictory to the

employer's stated purpose.  Absent this type of violation of the *Fuentes* standard, we will

not second guess the method an employer uses to evaluate its employees").

Alternatively, Walters asserts that van Beverhoudt's explanation of his choice of

Ware – that he would be "better for the office in the long run," (*Id.* at 87, 572-73) – evinced a discriminatory motive. As the District Court noted, the record reflects that "'in the long run' was van Beverhoudt's phrase of choice when informing employees they were not promoted." (*Id.* at 11.) It also may have been an appropriate description of the personnel decision, given that two years earlier Walters had been at the center of the dispute that caused the Assistant Inspector General for Audits to travel from Washington, D.C., to the Virgin Islands and threaten to close the Caribbean Field Office. In any event, "we do not think that th[ose] words alone could reasonably be viewed as sufficient to prove by a preponderance of the evidence that age was the determinative cause of" Ware's promotion. *Keller*, 130 F.3d at 1112; *see id.* (holding that employer's comment that "[i]f you are getting too old for the job, maybe you should hire one or two young bankers," without more, did not create a triable issue of fact in age discrimination claim).

Finally, Walters contends that the Caribbean Field Office has a history of discriminatory treatment strong enough to create an inference of pretext. *Fuentes*, 32 F.3d at 765 (plaintiff may clear summary judgment "by showing that the employer . . . treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons"). She notes first that, since her career began in 1986, a male has always been head of the Caribbean Field Office, and that van Beverhoudt selected Ware to continue that trend after his retirement. Her contention is

undermined by the fact that the two most recent GS-14 promotions were females, and had either woman stayed on at the office, she would have been the next supervisor. Walters also stresses that nobody of British West Indian descent has been selected to supervise the Caribbean Field Office. She has, however, failed to present any evidence that qualified applicants of her national origin have applied for the position.

## IV. **Conclusion**

As the District Court correctly noted, "Walters fails to discredit the [OIG]'s reasons for denying her promotion[,] [and her] beliefs and allegations of discriminatory animus, without more, do not meet the *Fuentes* pretext burden." (*Id.* at 13.) Accordingly, we will affirm its order of May 16, 2008 granting summary judgment in favor of the OIG.